William C. BISHOP, Appellant,

v.

UNITED STATES of America, Appellee.

No. 13444.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 5, 1957.

Decided March 28, 1957.

Bazelon, Circuit Judge, dissented.

Mr. Joseph E. Finley, Washington, D. C., for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll and Harold H. Titus, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, FAHY and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

█ In essence, the appellant in this case attacks the rule in force in this jurisdiction that a person may be convicted on the uncorroborated testimony of an accomplice where the court instructs the jury that such testimony, though competent, should be received with caution and scrutinized with care.[1] Appellant also urges that the evidence in this case was not sufficient to enable the jury to find appellant guilty beyond a reasonable doubt.

█ Appellant and one Young were indicted for robbery of a restaurant at gun point, Young pleading guilty and appellant standing trial. Appellant was found guilty and sentenced. Young was identified by the victims. Testifying for the Government, Young admitted the robbery and implicated appellant and one Osborne. Assuming, *arguendo*, that there was no corroboration of the testimony of the accomplice, Young, as to the presence of the appellant and the latter's participation in the crime, we nevertheless are of opinion that the conviction must stand.

█ The case of McQuaid v. United States, 1952, 91 U.S.App.D.C. 229, 198 F.2d 987, is particularly applicable to the instant case. There the same (among other) contentions were made as in this case, namely, that the evidence was not sufficient to support a conviction, that the accomplice witness was unreliable, and that there was no corroboration of the testimony of the accomplice witness. Judge Fahy, speaking for this court, said, 91 U.S.App.D.C. at page 230, 198 F.2d at page 989:

"We are unable to hold, as we are urged to do, that the evidence was insufficient to enable the jury to find appellant guilty beyond a reasonable doubt. It is true a principal witness against him was a self-confessed participant who had pled guilty to stealing the goods which appellant was charged with having received unlawfully. But the trial court instructed the jury that while as a matter of law they could convict upon the uncorroborated testimony of an accomplice, such testimony, though competent for their consideration, should be received with caution and scrutinized with care. No error appears here. Egan v. United States, 1923, 52 App.D.C. 384, 287 F. 958. This witness was in some respects vague and indefinite, but in other and critical respects he was clear and positive."

The principal witness, Young, is severely attacked by appellant.[2] But the jury had all the facts concerning her and, nevertheless, evidently believed her testimony. We cannot say they could not do so.

Appellant contends not only that there was no corroboration of Young's testimony but also that the testimony of the victims conflicted with her story. We do not think that such is the case. The witness, Nina Maddox, an employee at the robbed establishment, stated that after the robbery she went to the business establishment next door to call the police, that she noticed a blue car parked just beyond the next-door establishment, and that this car had at least one person in it, one at the driver's wheel; that the weather that evening was "raining and cold" and she could not identify the driver; and that when she came out of the next-door establishment the car was gone.

1. The District Judge in the instant case so instructed the jury.

2. Young testified that she was living with Osborne without marriage, was addicted to alcohol, and was a self-confessed participant in this and another robbery. She testified that she never drank so much that she could not do her housework and watch after her little girl, and that she was not drunk when she started out on the trip which resulted in the crime for which appellant stands charged. "Once or twice," to use her words, Osborne put her under a shower to sober her up. The occasion on which she committed herself to a hospital for treatment, referred to by the dissenting judge, was some three years before the commission of the crime under examination.

The witness, Wing, a partner in the robbed restaurant, testified that after the robbery he saw a man drive the car for Young.[3]

Appellant also contends that the testimony is not convincing as to his participation in the robbery. The witness, Young, testified that on the evening of the robbery she, the appellant and Osborne left the house where the three of them resided, in a blue Ford. They rode to Bethesda, Maryland, drove to a little side street, where they parked, and Osborne left the car. Bishop, who was driving the car, was asked by Young where Osborne had gone; he stated that Osborne had gone to "rob a place." Shortly thereafter Osborne came back, got into the car, and stated that he did not rob the place because there were too many people around. Young further testified that "[w]e were *all* talking about robbing some place." [Emphasis supplied.] Thereafter, the witness testified that the parties got to the vicinity of Sixth and H Streets, N. W., and it was decided that Young would rob the restaurant in question and they would wait in the car, and that this decision was reached as a result of conversation between Young and the other occupants of the car. To argue, under these circumstances, that no agreement on appellant's part to participate in the robbery was shown is naive indeed, to say the least.

We think the evidence in the instant case was sufficient for the jury to find appellant guilty beyond a reasonable doubt, and see no reason to depart from the established rule as to testimony of accomplices. Nor do we think there is any reason, as requested by appellant, to modify the rule.

Affirmed.

BAZELON, Circuit Judge (dissenting).

The case against appellant consisted of the testimony of three witnesses. Mr. Wing testified that Mrs. Young entered his restaurant alone on the night of December 13, 1953, held him up at gunpoint, took his money, left the restaurant, entered an automobile driven by a man, and rode off. A waitress at the restaurant testified to the same effect. Neither of these witnesses, however, identified appellant as the man in the automobile. Mrs. Young's testimony agreed with theirs, except in one respect. She said there were two men in the automobile, one of them being her lover, Vic Osborne, and the other the appellant. Appellant is thus linked to the crime by Mrs. Young's testimony alone.

The testimony of an accomplice, if true, is as probative of the facts of a crime as any other evidence would be. If we look askance at accomplice testimony, it is because we recognize that it is less likely than other evidence to be true. For that reason juries are instructed to receive such testimony with caution and scrutinize it with care. It does not follow, however, that the giving of such an instruction is in all cases adequate to discharge the duty of the court to assure that justice be done.

It would be difficult to conceive of a more unreliable witness than Mrs. Young.[1] But how much credence to place

---

3. Wing's testimony was as follows, on direct:

"Q. Now, you say you saw a man in the car? A. A man driving.

"Q. Where was the man in the car? A. Well, I can't tell. I know it is a man in the back. I know it is a man driving.

"Q. A man what? A. A man to drive the car.

"Q. A man driving the car? A. (The witness nodded affirmatively.)

"Q. Were you able—would you be able to identify the man that was driving the car? A. No, I can't see the man."

On cross-examination, he testified:

"Q. Could you tell anything about whoever was in the car? A. Well, kind of frost. I see she getting ready to close the door. I saw the one man drive the car.

"Q. You didn't see anybody else? A. No, I didn't see anybody. I see the man sitting over there."

1. She has confessed the commission of two robberies in addition to this one. She is

in her is for the jury to decide. The most significant parts of her testimony, moreover, could well be disbelieved in the absence of further explanation.[2] But that too is the jury's province. If appellant complained only that Mrs. Young is unreliable and her testimony incredible, I would not be disposed to interfere with the jury's conclusion.

Appellant's conviction, however, suffers from the following additional infirmities:

(1) Mrs. Young's testimony that appellant, as well as Osborne, was in the car with her is not only completely uncorroborated, but conflicts with the testimony of the disinterested witnesses that they saw only one man in the car.

(2) This discrepancy takes on added significance in the light of the fact that, in her earlier story to the police, Mrs. Young had agreed with the other witnesses that there was only one man in the automobile. She had then named appellant as the one man who was with her. When it was later discovered, despite her efforts at concealment,[3] that Osborne had been with her in the automobile, she nevertheless clung to her story about appellant, revising it, however, to include two men.

(3) Beyond placing appellant in the automobile, Mrs. Young tied him to the crime only by equivocal generalities.[4]

an extreme alcoholic, having once committed herself to a hospital for treatment for alcoholism and delirium tremens. She has attempted suicide "as a result of a nervous breakdown" and spent some months under hospitalization for that condition. On occasion, Osborne, the man with whom she was living, would find her so drunk that he had to put her under the shower to sober her up. As for the source of the great quantities of whiskey she required, she said, " * * a lot of times the bottle was bought for me," sometimes by Osborne, sometimes by Osborne's brother, and "sometimes some other men, too." She also admitted receiving money from "other men." On the day of the crime, Mrs. Young did what she "always" does— she started drinking whiskey in the morning, continued drinking in the afternoon, was drinking around suppertime, stopped for some drinks en route to the scene of the crime, took a couple of bottles along in the car, and immediately upon reaching home, "went into the bedroom to take a drink of whiskey."

2. The one piece of her testimony the Government relies on most heavily relates to an alleged incident before she, Osborne and the appellant drove downtown. She said they stopped somewhere in Maryland where Osborne got out of the car and she asked appellant where Osborne had gone. Appellant replied, according to her, that Osborne had gone to rob a place. In a few minutes, she said, Osborne returned saying he had not robbed the place because there were too many witnesses present. However, by Mrs. Young's own story, there had been no agreement to commit a robbery before the three left the house to go on their

drive and, since she sat between the two men in the car, Osborne could not have told appellant he was going to commit a robbery without Mrs. Young also hearing it. Her testimony could be true only if Osborne and appellant had planned a robbery and concealed their purpose from her. There was no evidence that such was the case. But, even if that were the case, it would be hard to understand how she, who was not party to the plan, turned out to be the actual robber. When asked why it was she who did the actual robbery, she said she did not know.

3. Mrs. Young says she was trying to protect Osborne who was at that time awaiting trial for another crime in Maryland.

4. By Mrs. Young's story, when she left home the night of the crime with Osborne and appellant, it was not for the purpose of committing a crime. She testified:

Well, we had finished dinner and we were sitting around just talking about first one thing and then another.
  *    *    *    *    *
And after a while Vic got up and went in the bedroom and got his coat. And he came back out. I asked him where he was going. He said he and Bishop were going out for awhile just for a ride.
I said, can I go along. He says, "Yes, if you want to." So I went in and got my coat and we went out and got in the car.

All three sat in the front seat, with appellant driving and Mrs. Young in the middle. As they were driving downtown, Osborne handed her a gun. She did not testify that appellant saw or could see this in the darkened car or that any-

Except for the incident referred to in note 2 supra, it does not appear from her testimony that he said or did any specific thing marking him as a participant in her crime.[5]

For all of the foregoing reasons, I would reverse the conviction. I would hold that it was error for the trial court not to have granted appellant's motion for judgment of acquittal, because "the evidence [was] such that reasonable ju-rymen must necessarily have [had a reasonable] doubt * * *." Curley v. United States, 1947, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232. Even if Mrs. Young's credibility was for the jury to determine, I think her uncorroborated testimony was too indefinite and equivocal for submission to the jury.[6] This is especially true where her testimony conflicted with testimony of disinterested witnesses and she is shown to have had a motive to lie.

thing was said about it in his presence. They stopped at Wing's restaurant and she got out, appellant saying, "I'll wait." She did not testify that she had told appellant that her purpose was to rob the place or that anything was said by anyone else as to that purpose. Someone (she does not remember who) said, "Well, that looks like a good spot." There is nothing to suggest that appellant suspected she would do anything other than purchase some food to take home. Indeed, when she entered the restaurant, that is what she pretended to be doing.

As for the agreement to rob Wing's restaurant, Mrs. Young testified: "In the meanwhile, we had decided to rob this place." Asked how that decision had been made, she said, "Well, it was decided that I would go in and rob the place and they would wait in the car." Prompted by the prosecutor, she agreed that the decision was "reached as a result of conversation between [her] and the other occupants of the car." As to what conversation there had been about a robbery, she said, "Nothing except that I would go in and rob the place and they would wait in the car for me." This seeming agreement is negated somewhat by Mrs. Young's testimony that she did not know how it happened that she rather than Osborne went in to do the actual robbery. Furthermore, she admitted that she did not hear appellant discuss robbery when they stopped for drinks at a tavern before driving downtown and that he had said "nothing specific" that whole evening about robbing any place and had said nothing about robbing Wing's restaurant. Some time during the evening, she said, "We were discussing the matter of money and it came up something about 'only way I know of is to rob a place' or something on that order." But she did not remember who said it. Nor did she remember who said, "That looks like a good spot," when they stopped at Wing's restaurant, nor whether anyone suggested stopping there, nor what either she or appellant said when she returned to the car.

When she returned to the car after the robbery, Mrs. Young again sat between appellant and Osborne. After they drove off, she took off her jacket and gave it to Osborne, along with the gun and the proceeds of the robbery. Osborne rolled the gun and the money in the jacket and stuffed it under the seat. Nothing in her testimony suggested that appellant, who was driving, saw the gun or the money being thus disposed of or was in any way aware of it. Then they drove home. Later that night she saw Osborne give appellant some money, but she did not know what money it was or the purpose for which it was given.

5. Mere presence at the time of the offense, or acquiescence, or failure to make any effort to prevent it, or even approval of the crime will not make a person either a principal, or aider or abettor, or an accessory before or after the fact. Clark & Marshall, Crimes 234–41 (5th ed. 1952).

6. Nearly half of the American jurisdictions have adopted statutory safeguards against uncorroborated testimony of accomplices. 7 Wigmore, Evidence 319–20 (3d ed. 1940). In at least two states, corroboration has been required by judicial decision. Watson v. State, 1955, 208 Md. 210, 117 A.2d 549; Witham v. State, 1950, 191 Tenn. 115, 232 S.W.2d 3. A conviction based on the uncorroborated testimony of an accomplice may be proper where, as in McQuaid v. United States, 1952, 91 U.S.App.D.C. 229, 230, 198 F.2d 987, 989, that testimony is in "critical respects * * * clear and positive." If, as in the instant case, the testimony falls far short of that standard, the McQuaid instruction to "receive with caution and scrutinize with care" is inadequate to protect the accused and justice requires that some more effective safeguard be interposed.