### UNITED STATES of America

### v.

### William L. DeLOACH, Sr., Appellant.

### No. 75–1026.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1975.

Decided Dec. 30, 1975.

Rehearing Denied Feb. 9, 1976.
Certiorari Denied June 1, 1976.
See 96 S.Ct. 2232.

---

Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C. (both appointed by this court), was on the brief for appellant.

Robert P. Palmer, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Stuart M. Gerson and William H. Collins, Jr., Asst. U. S. Attys., were on the brief for appellee.

Before TAMM, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Following a jury trial on an indictment containing three counts, two of which charged first degree murder (D.C. Code § 22–2401), appellant William L. DeLoach, Sr., was found guilty on two counts of second degree murder, as lesser included offenses, and of carrying a pistol without a license (D.C. Code § 22–3204).[1] On this appeal, DeLoach contends the evidence was insufficient to support the judgment and that the prosecutor's summation was prejudicially improper. We affirm.

I

 Much of appellant's argument as to the sufficiency of the evidence is based on an argumentative view of the facts that favors his contentions to an impermissible extent. On appeal, however, it is well settled that the court is to view the evidence in the light most favorable to the jury verdict.[2] The state-

---

1. The current convictions follow two prior trials. The first trial resulting in similar convictions was reversed on appeal. *United States v. DeLoach*, 164 U.S.App.D.C. 116, 504 F.2d 185 (1974). The second trial resulted in a hung jury.

2. *See, e. g., Glasser v. United States* , 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Clayborne*, 166 U.S.App.D.C. 140, 142, 509 F.2d 473, 475 (1974); *United States v. Wiebold*, 507 F.2d 932, 933 (8th Cir. 1974); *United States v. Dukow*, 465 F.2d 688, 689 (3d Cir. 1972); *Giragosian v. United States*, 349 F.2d 166, 168 (1st Cir. 1965); *Martin v. United States*, 335 F.2d 945, 951 (9th Cir. 1964); *Whaley v. United States*, 324 F.2d 356, 359 (9th Cir. 1963), *cert. denied*, 376 U.S. 911, 84 S.Ct. 665, 11 L.Ed.2d 609 (1964).

ment of facts that follow is in accord with this rule and thus deviates in material particulars from appellant's factual contentions.

Late in the afternoon on Sunday, September 26, 1971, one Stephen Davis, a truck driver employed by Joseph Jackson (Tr. 129–30), drove a stake-bodied trash truck to 5113 A Street, a four-plex apartment where Joseph's brother Harry Jackson lived (Tr. 137–38). While Davis was in the apartment, appellant De-Loach, the resident manager of the four-plex, entered and asked for a ride to Chillum (Tr. 145–47). It was agreed among them that DeLoach would be driven there (Tr. 147). Thereupon De-Loach, Davis, and Harry Jackson left the apartment and went to the truck (Tr. 94, 96–97, 104, 106–09, 150–52). Davis drove, Jackson sat in the middle of the cab and DeLoach sat next to the door (Tr. 150). When the truck reached South Dakota Avenue and Riggs Road, Northeast, appellant got out to make a telephone call (Tr. 153). He returned shortly thereafter and stated that the people he intended to see were not in (Tr. 154). But as they started to drive away, DeLoach noticed a dark Cadillac stopped for a light ahead of them on Third Street, Northeast, and said, "There's the people I want to see" (Tr. 154–55).

The Cadillac contained a male driver and a woman passenger (Tr. 155) who were later determined to be Francis Harper, a dealer in illicit drugs (Tr. 387), and his girl friend, Brenda Willis (Tr. 387), who was riding in the front seat as a passenger (Tr. 333–34). Beside Miss Willis, on the seat of the car in a plastic container, were cocaine and heroin having a wholesale value of $4,000 (Tr. 334–35, 337; Govt. Ex. 16a, 16b).

Davis stopped the truck at the traffic light and DeLoach and Jackson got out. DeLoach walked up to the Cadillac and began talking to the driver while Jackson went to the passenger's side of the Cadillac and stood on the sidewalk (Tr. 155–56). While this was happening, Davis pulled the truck "around" the Cadillac (Tr. 156, 159), turned right on Riggs Road, made another right turn on First Street, and then drove the truck "up to the end of the corner" (Tr. 159–60). As he reached that area on First Street, Davis noticed the Cadillac he had first seen on Third Street "coming around" (Tr. 159–60), so he pulled the truck over to the curbing and stopped it on First Street about a quarter of a block away from the intersection of Kennedy Street, Northeast (Tr. 161; Govt. Ex. 1). Davis stayed in the truck (Tr. 161, 164).

The distance the two vehicles travelled from the time Davis pulled the truck around the Cadillac on Third Street until he saw it "coming around" the corner of Riggs Road onto First Street, the time that elapsed while they were moving their respective distances, and the details of the shots fired from "in the car" all could have allowed the jury to conclude that DeLoach and Jackson had ridden in the Cadillac from where they first met it on Third Street. This is a distance of about three normal city blocks (Govt. Ex. 5A).

When the Cadillac reached a point on First Street about one-quarter of the distance from Riggs Road to Kennedy Street, the person seated in the left rear seat shot Brenda Willis in the head three times with a .38 caliber revolver (Tr. 350–67; Govt. Ex. 21); the person seated in the right rear seat shot Francis Harper once with a .22 caliber revolver (Tr. 286, 293–96; Govt. Ex. 12). These initial shots were immediately fatal to Willis, but not so to Harper, who fell out or somehow got out of the car and began running. Immediately after the above-described initial shots (Tr. 27, 29–30, 35), a tall, thin man with a gun in his hand (Tr. 13, 15, 18, 28–29) got out of the Cadillac, ran to the truck and got in the cab on the passenger's side (Tr. 161). Stephen Davis later identified this man as Harry Jackson (Tr. 161, 163, 165). Meanwhile Harper appeared to fall out of the Cadillac (Tr. 11, 13) and was thereafter chased (Tr. 39–41) by a short, stocky man (Tr. 81–82), who fired twice at Harper while both men were running. The stocky man (who the evidence indicates was DeLoach, see text at 995–998 infra) was observed to have a gun in his

hand at this time (Tr. 163, 206). These shots caused Harper to fall, and after he fell his pursuer walked up to Harper while he was lying face down on the ground and shot him once more with a .38 caliber hand gun (Tr. 39–41).

While this was going on, Davis, who had parked his truck about one-half block away from where the Cadillac was when the first shots were fired (Tr. 160, 161; Govt. Ex. 1), had stayed in the driver's seat. When he heard the initial shots he looked into the rear-vision mirror (Tr. 161) and saw DeLoach running up the street with a gun in his hand *at about the same time* that Jackson got in the cab beside him on the passenger's side of the truck (Tr. 161, 163, 165). Almost immediately thereafter, DeLoach ran up the street from the vicinity of Harper's body (Tr. 162), crossed in back of the truck (Tr. 162), and also got into the cab, taking the seat next to the door on the passenger's side (Tr. 162). Davis immediately drove the truck away at a high rate of speed (Tr. 163–64) to Madison and Missouri Avenues and 6th Street, where Davis stopped the truck and DeLoach left (Tr. 166).

Shortly thereafter at about 6:50 P.M., following receipt of a radio lookout for the truck, Officers Simpson and Pagliarulo stopped the truck several blocks away from the 3600 block on Georgia Avenue. At that time only Davis and Harry Jackson were in the truck. The officers searched the occupants and the truck, found no weapons (Tr. 307), and released the men and truck at about 7:05 P.M. because they considered the truck did not exactly fit the description of the wanted truck that they had received over the radio (Tr. 266, 303, 311).

Late that same evening, about 10:00 or 10:30 P.M. (Tr. 395), John Harper, a former amateur boxer and the brother of the slain Francis Harper, learned of his brother's death and immediately went to DeLoach's apartment, accompanied by Shirley Jackson and John Washington (Tr. 395–96). He identified himself to DeLoach as the brother of Francis Harper, whereupon DeLoach came to the door with a .32 automatic pistol in his hand (Tr. 397). John Harper then asked DeLoach if he knew his brother had been killed. DeLoach replied, "No. I just finished arguing with him," on the telephone (Tr. 398).

On or about October 14, 1971, DeLoach asked John W. Parker to drive him to Alderson, West Virginia so DeLoach could see his girlfriend who was imprisoned there (Tr. 426). "Late in the evening" on Saturday, October 16, 1971 (Tr. 426–28), Parker, with his automobile, met DeLoach at Georgia and Missouri Avenues (a block or two from Missouri, Madison and 6th Street) (Tr. 427) and drove him to Alderson (Tr. 427–31). They arrived there on Sunday, October 17th, and with DeLoach's acquiescence Parker registered for them at a motel under the alias of Walter Johnson (Tr. 428, 432–33). Later that day, when they arrived at the women's prison, a prison guard recorded the license number of their car (Tr. 434, ·438). Parker asked DeLoach why the guard was taking down the number and DeLoach replied that he was in some kind of trouble and that he would tell Parker about it later (Tr. 437–38).

Shortly thereafter, DeLoach was arrested by West Virginia authorities on the instant offenses (Tr. 440, 468). At the time of his arrest he had $1,608 in cash on his person (Tr. 440, 469).[3] The denominations of the currency in his possession[4] were consistent with those that John Harper had observed in his broth-

---

3. Two $100 bills, three $50 bills, forty-three $20 bills, one $5 bill, and three $1 bills (Tr. 392–93, 469). He was also in possession of a .32 caliber automatic pistol similar to the one described by John Harper as having been in the possession of DeLoach when Harper talked to him on the night of the murders (Tr. 397, 399, 403–04). Although this gun was ruled out as a murder weapon, it was directly relevant to the third charge against DeLoach, that of carrying a pistol without a license.

Since it was admitted into evidence without objection (Tr. 407) and without the Government showing that DeLoach "was arrested with the gun on him" (Tr. 406), the prejudicial effect of the pistol was minimized so far as DeLoach was concerned while the Government was able to show that Harper's testimony that DeLoach had a .32 handy when Harper came to visit him was not something the Government "grabbed out of midair" (Tr. 406).

er's possession on the day of the murders (Tr. 392–93, 469).

Appellant did not offer any evidence.

The principal witness for the Government was Stephen Davis, who had previously been indicted along with DeLoach, Harry Jackson and Joseph Jackson, and who testified to the foregoing facts under a grant of immunity and a promise that he would not be prosecuted. Prior to hearing his testimony the jury was completely instructed as to the circumstances of his testifying and as to the standards they should apply in evaluating his testimony.[5] Davis' testimony recited the essential facts of the murders and, if believed by the jury (as apparently was the case) was sufficient alone to support the conviction.

In addition there were four other eyewitnesses. Two fifteen-year-old (Tr. 25) twin girls, Charlene (Tr. 8–24) and Darlene Medlock (Tr. 25–37), had been walking up First Street on their way home from a nearby store at about 6:30 P.M. on the evening of the murders. Hearing gunshots coming from "in the car" (Cadillac) (Tr. 13, 21) on the street behind them (Tr. 11, 13; Govt. Ex. 1), they turned and saw one man fall out of the driver's side of the car[6] and then saw a tall, slim (Tr. 28, 18) man getting out of the car from the "driver's seat in the front" (Tr. 12, 18)[7] and start running in their direction. This man had a gun in his hand (Tr. 13, 15, 18, 28–29). Somewhat later they returned with their father to the scene and saw the man who had fallen from the car lying in the street near where they had earlier seen him fall (Tr. 17).

Woodrow Hamiel, a passing motorist who turned onto First Street from Kennedy Street and drove towards Riggs Road just as the Medlock twins were running from the scene, saw (from inside his car) one man chasing and shooting at another man; saw the pursuer fire twice at Harper and then, after the victim fell to the ground, saw the assailant walk up to Harper and fire one shot more into his body as he lay face down upon the ground. Hamiel then saw the assailant run to the truck, and jump in the cab "on the passenger side." The truck was driven away immediately (Tr. 39, 41).

Another eyewitness to some of the events was Martha Putney, who was sit-

4. See note 3 *supra*.

5. The court's instruction, given prior to Davis' testimony, follows:

> Ladies and gentlemen of the jury, with respect to the testimony of Stephen Davis which you are about to hear, I instruct you that this evidence will be adduced—will develop among other things that he has testified, as a result of an order of the Court, as a Government witness, under authority of the law by which he has been granted immunity.
>
> What this means is that the testimony which Mr. Davis will give in this proceeding may not be used against him in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order of this Court.
>
> In this connection, it must be noted that evidence will also be adduced at this trial that the Government promised Mr. Davis that he would not be prosecuted for his involvement in the offense which is the subject matter of this trial, if he cooperated with the Government in this case, and that it was Mr. Davis' full understanding that he will not be so prosecuted for these offenses.
>
> You are instructed that one who testifies under a grant of immunity with a promise from the Government that he will not be prosecuted is a competent witness and you may convict a person accused of crime upon the uncorroborated testimony of such a witness, if you believe that testimony proves the guilt of the defendant beyond a reasonable doubt.
>
> However, such a witness' testimony should be examined by you with greater car [*sic*] than the testimony of an ordinary witness. You should scrutinize it closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness' own interest, for such a witness, confronted with the realization that he can procure his own freedom by incriminating another, has a motive to falsify.
>
> You should receive such testimony with suspicion and act upon such testimony with caution.

6. Charlene described the part of the car that "the man who was falling out came from" as "the driver's rear" (Tr. 11–12).

7. At the time they observed these events they were about at the middle of the block on First Street between Riggs and Kennedy St. (Tr. 28; Govt. Ex. 1). This would place them midway between the Cadillac and the truck (Govt. Ex. 1).

ting in her kitchen in a house situated near the murder scene when she heard three of the initial shots coming from the direction of First Street (Tr. 79).

She first went to her front window and saw what appeared to be a Cadillac slowly moving across the street "with the door on the driver's side ajar" (Tr. 79); she then moved to another window on the ground floor and saw a "stocky, short man" (Tr. 81) crouched down with his hands in his pockets (Tr. 81–82).[8] She also saw him "straight up" (Tr. 82) and later saw the man she had seen crouched down running in the direction of the truck (Tr. 82–83; Govt. Ex. 1).

The Chief and Deputy Medical Examiners of the District of Columbia testified to the number and caliber of bullets found in the respective victims and as to their angles of entry (Tr. 285–87, 358–67; Govt. Ex. 12, 21).

Also, most importantly, Mary Miller, who lived in a house next to the apartment building where DeLoach was resident manager, further corroborated the testimony of Davis that he drove the truck away from 5113 A Street and that DeLoach went along as a passenger. She identified DeLoach and further testified, that at about 5:00 P.M. on the day in question, from the front porch of her home she had seen DeLoach leave the apartment and get into the cab of the truck on the passenger side. The truck was then driven away (Tr. 94, 96–97). She had seen the truck in front of her house many times, and stated that it was driven on that day by the man who customarily drove it (not DeLoach) (Tr. 93) and that she had never seen DeLoach in the truck before (Tr. 94, 97, 116).

## II

The foregoing facts are fully sufficient to support the convictions, but necessarily rest on a premise of identification—that DeLoach was one of the two men in the truck who left it and participated in the murders of Harper and Willis on First Street, Northeast. Proof of DeLoach's participation in these crimes results from a collocation of the facts flowing from direct and circumstantial evidence. As in most such cases, the great strength of the conclusion that it was DeLoach who committed the crimes of which he was convicted lies in the clear pattern that emerges from strands of evidence garnered from unrelated sources which, when woven together, produce a strongly consistent and harmonious conclusion pointing to guilt beyond a reasonable doubt. Appellant's counter argument largely attacks the direct and circumstantial testimony that identifies him as the person who first approached the Cadillac from the driver's side and as the short, stocky man with the .38 caliber firearm at the scene of the crimes who was observed to shoot Harper in the street after Harper fell from the Cadillac.

Davis' testimony that it was DeLoach who originally approached the car from the driver's side is not contradicted in any respect.[9] Thus the jury could well have concluded that it was DeLoach who sat in the left rear seat of the Cadillac from where the .38 caliber shots that killed Brenda Willis were fired.[10] Thereafter, the sequence of events, as testified to by all eyewitnesses, supports the conclusion that the last assailant to leave the murder scene on First Street was the

---

**8.** She testified he had "grey slacks and a grey sweater and a hat"; age, in the area of "thirty-eight to forty-eight" (Tr. 82).

**9.** At oral argument appellant suggested that Davis might have been the man who shot Harper, but there is no testimony to that effect. What testimony there is indicates that Davis was wearing a shirt with black and white vertical stripes when the truck was stopped by police after the murders (Tr. 310), and that none of the eyewitnesses saw a person so dressed at the scene of the murder.

**10.** The testimony of the medical examiners indicates that Brenda Willis was killed by three

shots from a .38 caliber weapon fired from the direction of the left rear seat (Tr. 367–68), and that a .22 caliber bullet wound on Harper's face could have come from a shot fired from the right rear seat (Tr. 296). This wound on Harper's face was very likely the first one inflicted (i. e., while Harper was still in the car) because it is the only one that would not have prevented him from leaving the car (Tr. 296). The remaining wounds on Harper's body were all inflicted by a .38 caliber weapon, and thus the fatal shots to both Harper and Willis were fired from a .38 caliber pistol (Tr. 229–300, 372).

man who shot Harper in the street with a .38 caliber pistol and then was the last man to jump in the cab just before it was driven away (Tr. 15, 39–41, 43–44, 155–56). Davis testified unequivocally that the last man into the truck was DeLoach (*see* text at 990–995 *supra*).

The Medlock twins testified that the tall, slim, black man with the bush haircut jumped from the car and ran in the direction of the truck (toward Kennedy Street) with a gun in his hand (Tr. 12, 18, 22, 28). This description fits Harry Jackson (Tr. 131) and does not fit De-Loach. The twins were in flight shortly after they heard the first shots and never saw a second gunman even though they saw one man fall out of the Cadillac (Tr. 11, 27). Their last glance backward apparently occurred just before DeLoach got out of the Cadillac, and they never heard or saw the multiple shots which were fired, according to Hamiel, into Harper's body by the man who chased him (Tr. 19). Charlene Medlock testified that her attention was focused in front of her as she was running away from the scene of the crime (Tr. 16). This is understandable.

The appellant bases his major argument on the testimony of Hamiel, the only person to actually see a murder. Hamiel described the person that he saw

shoot Harper as "kind of a stocky fellow" aged "45 or 50," about 5′9″ tall and weighing about 155–160 pounds (Tr. 44). The appellant places great emphasis on the fact that Hamiel would not identify DeLoach (or anyone else) as the man he saw that day and on the fact that Hamiel, a heavy man himself, estimated the weight of the assailant to be considerably lighter than the description of De-Loach as given by Stephen Davis who testified that on the day of the crimes "[D]eLoach . . . *looked to be* about five ten, *230 pounds* . . . [and was] in his forties . . . [and that there had been] [n]ot much . . change in him from that time until now" (Tr. 130, emphasis added). It is the difference between the 155–160 pound estimate of Hamiel and the 230 pound estimate of Davis upon which appellant centers his attack on the jury's conclusion that DeLoach was the assailant. From this single variation in *estimated* weights, an attempt is made to build a whole claim of misidentification—that Hamiel could not have been describing DeLoach. This argument completely overlooks the other items of Hamiel's identification that do fit DeLoach and attempts to ignore the positive aspects of Davis' testimony which implicate De-Loach.[11]

11. Outside of the estimate of DeLoach's weight, appellant seeks to have us reject Davis' testimony on the ground that "many jurisdictions refuse to permit conviction to rest on uncorroborated accomplice testimony" (App. Brief at 28), citing *People v. Mostafa*, 5 Ill. App.3d 158, 274 N.E.2d 846 (1971). While that may be true in some state courts, the general rule in federal courts is that uncorroborated accomplice testimony is sufficient to sustain a conviction. *See, e. g., United States v. Jones*, 425 F.2d 1048 (9th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). Some circuits add that the accomplice's testimony must be credible and substantial, *see, e. g., United States v. Cady*, 495 F.2d 742 (8th Cir. 1974); we find those criteria met here. Moreover, appellant has overlooked precedent directly opposite to his argument in this circuit. *Bishop v. United States*, 100 U.S.App. D.C. 88, 243 F.2d 32 (1957); *McQuaid v. United States*, 91 U.S.App.D.C. 229, 198 F.2d 987 (1952), *cert. denied*, 344 U.S. 929, 73 S.Ct. 499, 97 L.Ed. 715 (1953). Finally, we reject the idea that Davis' testimony was uncorroborated. It was corroborated in material respects by Mrs. Miller, Mrs. Putney, Hamiel, the Med-

lock twins and others. As we point out repeatedly in this opinion, the testimony of all the witnesses fit together into an internally consistent pattern from which a jury could easily have concluded that DeLoach participated in the murders. The minor contradictions which appellant points out between the testimony of Davis and that of other witnesses—such as the number of persons who left the four-plex with DeLoach that afternoon and the time they departed, *see* App. Brief at 16–18, 28–29—go to the weight of Davis' testimony and were for the jury.

Appellant's second main contention is that the testimony of Davis, even if given full credit, will not support a conviction. Citing *Bailey v. United States*, 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969), appellant contends that, because Davis' testimony does no more than place DeLoach at the scene and does not show him entering the Cadillac or murdering its occupants, it is legally insufficient for conviction. But this testimony does not stand alone and with the additional testimony is fully sufficient to support the verdict. *Bailey, supra*, relied on by appellant, is inapposite here, because the

Moreover, Hamiel's testimony as to the physical stature of Harper's assailant is supported by the testimony of Putney, who also, like Hamiel, described him as "stocky, short—about five foot six, five five or five six" (Tr. 81–82). She saw him "in a crouched position" (Tr. 81) but also saw him straight up (Tr. 82). A common picture of the assailant as a short, stocky man thus emerges from the testimony of the witnesses who saw this participant in the crimes. To be sure, the descriptions do not exactly tally with one another; but such minor inconsistencies in descriptive testimony, where several witnesses testify to their varying estimates of height, weight, age, time and to their recollected observation of wearing apparel, color, mustaches, haircuts, etc., are a hallmark of truth, since it is virtually impossible to see and recall all personal features *exactly* the same where different witnesses are located at different locations and have different backgrounds and abilities to observe. If such witnesses testify *exactly* the same, it is highly unusual. The variations in description are explainable by the different location of different witnesses, and by their individual ability to observe, the length and focus of their observation, and their ability to recall and to articulate to the jury what they observed. Such individual differences can be grounded in the differing ages, backgrounds and experiences of the witnesses. A jury takes all these varying factors into consideration in evaluating identification testimony; when that has been done, its conclusions must be highly respected since this is a function which the jury, having actually observed the demeanor of the individual witnesses, is better able to perform than an appellate court.

Appellant's attack upon the testimony describing him as the assailant also ignores logic and reason. There were only two men involved in the murders. No person testified to more than two participants, and the sum total of all testimony is that there were two men—a "tall, thin" man with a bush haircut and a "short, stocky" man wearing a hat.[12] When the second series of shots were being fired at Harper at close range in the street, Jackson—the only "tall-thin" man on the scene—had just about reached the truck. That left only the "short, stocky" man on the scene—close to Harper (Ex. 1), *cf.* Govt. Ex. 1. De-Loach is the only person that fits that description.

Also, the testimony as to the weight of DeLoach was *all* based on estimates—and estimates as to the weight, height and age of individuals can vary greatly and be wide of the true mark. There could be many reasons for a discrepancy in weight estimates. First, the person estimating may have had no experience judging weights. Also, one person may give an estimate as to the weight of a person fully dressed and another, as with those familiar with various forms of athletics, will think and estimate only in terms of stripped weights. There is also a difference in the appearance that weight gives one person as compared to another. The appearance of weight of a conditioned athlete or one customarily engaged in heavy manual labor may vary greatly from those who live a more sedentary life; such persons carry their weight differently, thus creating different impressions as to their bulk. Furthermore, individuals who are not accustomed to estimating weights, or to having the accuracy of their estimates verified, may not be good judges of weights. It is also more difficult to estimate the weights of moving persons seen only for a short fleeting moment of time especially if one's attention is focused on other considerations. Thus a description of "stocky, short" may be given more weight by a jury than an estimate in pounds. The jury could well have concluded that while Hamiel may have underestimated the weight of the assailant, Davis may have overestimated it.

evidence of DeLoach's involvement here far exceeded mere presence.

12. Both Hamiel and Putney testified that the man in the street who shot Harper had on a hat (Tr. 44, 82).

Finally, the testimony of Mary Miller may provide a clarifying clue as to the reason for the variation in the weight estimates. For 33 years she lived next to the building where DeLoach had been resident manager. She had "seen him around that building . . . I guess about a year . . . many times" (91–93). She saw him in court and also remembered him at the time of the September, 1971 crimes. She testified that when she saw him enter the truck with Davis she remembered him as having at that time been "smaller in size. Not as fat . . . I don't think he was quite as large" as he was at the time of the October, 1974 trial.[13]

Thus, recognizing that Hamiel's weight figure was only a fleeting estimate given at a time when he was seeing a murder and hence possibly not as interested in estimating weights, any variation in his estimate from DeLoach's correct weight is explainable by the inherent difficulty of making a completely accurate estimate, the differing personal standards of personal perceptions, and the possibility that DeLoach's weight may have increased substantially after the crime. What comes through all the argument about weight is the testimonial characterization of the assailant as "stocky"—and this would hardly fit a 155–160 pound 5′9″ person. So Hamiel's identification testimony, including his weight estimate in pounds—upon which appellant relies almost completely for reversal—is internally inconsistent and thus cannot be considered completely reliable as an estimate of the assailant's weight, although it is apparently reasonably accurate in describing DeLoach in other particulars. Hamiel's testimony also was generally consistent in other particulars with the testimony of the Medlock twins, Martha Putney, Mary Miller and Davis. Therefore, we conclude that the jury was fully justified in relying on this, the other testimony, and the circumstantial inferences deducible therefrom, in finding beyond a reasonable doubt that DeLoach participated in the crimes of which he was convicted.

### III

■ The second point advanced by appellant is a claim that the Assistant United States Attorney misstated the evidence in his argument to the jury and in so doing was guilty of prejudicial misconduct. This argument centers chiefly on the prosecutor's references to that portion of the Hamiel testimony which was related to the identification of the assailant who shot Harper in the street. Hamiel was unable to identify this man, but in his testimony he described him:

A. Well, he looked like he weighed about 155 or 160, about five nine, *kind of a stocky fellow.* He had on a brown hat, light clothes, and looked like he [was] about 45 or 50, as far as I can describe him.

(Tr. 44, emphasis added). Davis testified that at the time of the offense DeLoach was 55 years old and he estimated he weighed 230 pounds (Tr. 130). Appellant points to the variance between Hamiel's weight estimate and that of Davis as being conclusive that Hamiel did not describe DeLoach. However, as pointed out above, those who are unfamiliar with

---

13. Q. Mrs. Miller, just a couple more questions. With reference to Mr. DeLoach's appearance on September 26, 1971, how would you describe his appearance as to height and weight, as you remember him that day, if you can?

A. Maybe he was *smaller* than he is now, but I can't tell.

Q. Pardon me?

A. Maybe he was smaller than he is now at that time, I don't know, in size. I don't mean shorter. I mean smaller in size. *Not as fat.*

MR. COLLINS: Mr. DeLoach, will you stand up again, please?

BY MR. COLLINS:

Q. You are saying you think he was *smaller in size at that time?*

A. Yes.

Q. How about his height?

A. I can't tell no difference about the height. I can't see where he is any shorter. But *I don't think he was quite as large.*

Q. How about his age at that time. How would you describe his age back in 1971?

A. Well, I would imagine he was over 50.

MR. COLLINS: All right. That's all.

(Tr. 113, emphasis added).

weights of other people or who are unaccustomed to judging people's weights can be very wide of the mark; and practically *all* the other testimony definitely pointed to DeLoach. (*See* text at 990–995 *supra*. To summarize: it would be hard to imagine a person 5′9″ tall and weighing only 155 or 160 pounds being described as "kind of a stocky fellow." Davis' description of DeLoach's actual weight at the time serves to explain Hamiel's "stocky" description. This is important because when Martha Putney, following the firing of the first shots, viewed the scene from her second window she saw a "stocky, short" man (Tr. 81–82) and later saw this man running toward Kennedy Street toward where the truck was parked (Tr. 82–83). At no time did she see a tall, thin, black man, as Harry Jackson definitely was. So with only two men involved, all the testimony excludes the tall, thin man and points directly to the short, stocky man as the killer of Harper; of the two men placed by Davis near the Cadillac, DeLoach was the only man who fit the short, stocky description.

It is also very important that Davis—who knew DeLoach and drove him to the place where he got out to approach the Cadillac—definitely identified DeLoach as the only man who remained on the street when, according to Hamiel, Harper was shot. Thus, it was clearly within the province of the jury to conclude from all the testimony that the man wearing the hat who chased Harper, shot him in the street and was the last of the two men to enter the cab of the truck, was DeLoach.

Against this testimonial background, appellant complains of the following remarks in the prosecutor's summation which relate to the identification of De-Loach:

> You also have the testimony of Mr. Hamiel to support that; he was the man that testified he saw a man fitting the description of this defendant chasing the deceased across First

Street and firing three shots . . .
[Nov. 4, Tr. 57C]

\* \* \* \* \* \*

*Now, doesn't this* [testimony of Hamiel and the Chief Medical Examiner for the District of Columbia] *tell you—doesn't this actually make a picture for You?* [Nov. 4 Tr. 57–D]

\* \* \* \* \* \*

Mr. Hamiel saw this defendant, *didn't see his face, but he described a man in his fifties, and this defendant is in his fifties—a man five foot seven to five foot nine—oh, it is going to be argued that he was off on the weight*[14] *but ladies and gentlemen, the fact is that Hamiel described a man whose age and height are similar to this defendant's running up the street, after having shot Harper, get into the passenger side of the truck which is parked there and just as Stephen Davis said it was.* [Nov. 4 Tr. 57G] Hamiel . . . sees this defendant, DeLoach, chasing Harper and firing three shots . . . [Nov. 4 Tr. 59]

\* \* \* \* \* \*

*I submit to you that the facts we have discussed to this point almost make a case against this defendant even without considering the testimony of Stephen Davis. However—we do have Mr. Davis' testimony.*

You heard Mr. Hamiel, who I again emphasize was a neutral person here, saw a man fitting his [appellant's] description, saw him shot [*sic*] Harper three times. [Nov. 4 Tr. 79] . . .

*This man* [Hamiel] *comes down here and testifies before you, and you have heard him describe how this defendant or a man resembling him stooped over Harper, stood over Harper and put a bullet in his head.* [Nov. 4 Tr. 80].

Those portions of the summation which the brief of appellant fails to include as part of the argument (Appellant's Brief at 31), but which should be included to

---

14. Appellant's refusal to include this significant remark by counsel actually distorts the whole tenor of the Government argument.

The footnoted statement is a plain admission that Hamiel's "identification" of DeLoach was "off on the weight."

give a more accurate presentation of the prosecutor's summation, are italicized.

With respect to those extracts of the prosecutor's remarks that he set forth in his brief, appellant complains that "the Government twice told the jury that Hamiel saw DeLoach, and twice more told the jury that Hamiel saw a man fitting DeLoach's description" (Appellant's Brief at 31). Basically the contention is that the prosecutor intentionally misrepresented the conclusions that were permissible from the evidence. However, it was made crystal clear to the jury, and the Government admitted, that Hamiel had *not* been able to identify DeLoach personally as the actual killer— he had only been able to give a description of the short, stocky man he saw fire three quick shots in the street and then run away. These descriptive facts, however, were fully sufficient, when added to the testimony of Davis, the Medlocks, Putney and Miller, to support the conclusion that DeLoach was the killer and for the Government to argue that inference to the jury. The additional arguments in summation by the prosecutor that are set forth in italics above clearly indicate that he did not misrepresent Hamiel's testimony. First of all, the prosecutor indicated it was his *contention* that the testimony "make[s] a picture for you" (Nov. 4 Tr. 57D). Then the prosecutor clearly outlined the deficiencies as well as the strengths in Hamiel's testimony (Nov. 4 Tr. 57G–58), and candidly stated that all of the testimony (including necessarily that of Hamiel), without that of Davis only, "*almost* make a case against this defendant" (Nov. 4 Tr. 59, emphasis added). Of course DeLoach in reply argued the descriptive factors that he contended did not identify him (Nov. 4 Tr. 69–71).

▨ The factual evidence of identity with its strengths and weaknesses was thus fairly presented to the jury by the prosecutor; and since DeLoach was personally present in the courtroom, the jury was better able to judge the identification testimony than any appellate court. It is also significant, though we do not rely on this point, that no objection was made at trial to the argument that appellate counsel now attacks (Nov. 4 Tr. 82).[15] For all of the above reasons we thus see no proper basis for disturbing the verdict of the jury. We also reject several other objections by appellant to prosecutorial argument which are based on an unreasonably restrictive view of permissible evidentiary inferences.

*Affirmed.*

---

**15.** Appellant's failure to raise a timely objection to the alleged errors in the prosecutor's closing argument, in the absence of the kind of flagrant abuse which is not present here, will bar a defendant from raising the point on appeal. *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 238–39, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Polack,* 442 F.2d 446 (3d Cir.), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2253, 29 L.Ed.2d 710 (1971); *United States v. Murphy,* 374 F.2d 651, 655 (2d Cir.), *cert. denied,* 389 U.S. 836, 88 S.Ct. 47, 19 L.Ed.2d 98 (1967). The point was also considered in *United States v. Trutenko,* 490 F.2d 678 (7th Cir. 1973), where the court observed:

> [W]e consider it significant that experienced and competent trial counsel did not object to the prosecutor's comment. We do not hold that the error was waived because we recognize the tactical considerations that militate against interrupting an adversary's closing argument. We are inclined to believe, however, that if the comment were sufficiently prejudicial to warrant reversal, counsel who was present at the time either would have objected forthwith or else would have requested the trial judge to give a curative instruction. There was opportunity after argument, and before the court instructed the jury, to make such a request. The absence of any such request tends to corroborate our appraisal of the probable impact of the remark as minimal.

*Id.* at 680. That analysis seems equally applicable here.