UNITED STATES of America, Appellee,

v.

Harold V. GLEASON, Paul Luftig and J. Michael Carter, Defendants-Appellants.

Nos. 125, 126 and 137, Dockets 79–1147, 79–1151 and 79–1208.

United States Court of Appeals, Second Circuit.

Argued Oct. 9, 1979.

Decided Dec. 19, 1979.

Certiorari Denied March 17, 1980. See 100 S.Ct. 1320.

Stanley S. Arkin, New York City (Mark S. Arisohn, Arthur T. Cambouris, Stanley Neustadter, Arkin & Arisohn, P.C., New York City, of counsel), for defendant-appellant Gleason.

Harold R. Tyler, Jr., New York City (Michael B. Mukasey, Kenneth A. Caruso, Marjorie T. Coleman, Mark R. Hellerer, Patterson, Belknap, Webb & Tyler, New York City, of counsel), for defendant-appellant Luftig.

Otto G. Obermaier, New York City (Martin L. Perschetz, Obermaier, Morvillo, Abramowitz & Fitzpatrick, New York City, of counsel), for defendant-appellant Carter.

John J. Kenney, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Mary Ellen Kris, Charles M. Carberry, Richard D. Weinberg, Asst. U. S. Attys., New York City, of counsel), for appellee.

Moore, Berson, Liflander & Mewhinney, New York City (Earle K. Moore, Matthew L. Lifflander, New York City, of counsel), for amici curiae Group of Bankers.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Harold V. Gleason, former Chairman of the Board of the Franklin National Bank (FNB), Paul Luftig, its former president and chief administrative officer, and J. Michael Carter, its former senior vice president in charge of its Investment Division, appeal from judgments of the District

Court of the Southern District of New York, entered on March 27, 1979, by Judge Thomas P. Griesa after an eight-week jury trial, convicting them (except for dismissal of charges in Count Three against Carter) of (1) making false entries in the bank's records on or about March 31, 1974, by false evaluation of securities with intent to defraud, thereby concealing operating losses in excess of $5 million and making it appear that FNB had a profit of $79,000, for the first quarter of 1974, all in violation of 18 U.S.C. § 1005[1] (Count Two), (2) making false entries in the bank's records on or about March 31, 1974, with intent to defraud, by causing FNB to enter into fictitious foreign exchange contracts showing a non-existent profit in excess of $2 million, which falsely made the bank appear to have a profit for the first quarter of 1974 when in fact it had suffered heavy losses, also in violation of 18 U.S.C. § 1005 (Count Three),[2] (3) making false statements to the Manufacturers Hanover Trust Company on or about April 18, 1974, to influence its action in fulfilling a $35 million loan commitment previously made to FNB, by submitting to Manufacturers Hanover a consolidated income statement for the first quarter of 1974, ending March 31, showing a profit of $79,000 when in fact the bank had suffered losses of over $7 million, in violation of 18 U.S.C. § 1014[3] (Count Four), (4) employing a manipulative scheme or device during March 1974 and on various dates in April and May 1974, in connection with the purchase and sale of FNB stock by using the foregoing falsifications of bank records to make it appear that the bank had realized a profit for the first quarter of 1974, when in fact it had suffered heavy losses, in violation of 15 U.S.C. §§ 78j(b) and 78ff[4] (Counts Five through Fourteen), and (5) conspiracy to commit each of the foregoing crimes, in violation of 18 U.S.C. § 371 (Count One). In addition, Luftig alone was convicted of making false material declara-

---

1. Title 18 U.S.C. § 1005 provides in pertinent part:

 "Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

 "Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

2. The charge in Count Three against Carter was dismissed by the court at the end of the Government's case.

3. Title 18 U.S.C. § 1014 provides in pertinent part:

 "Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, any member of the Federal Home Loan Bank System, the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, or the Administrator of the national Credit Union Administration, upon any application, advance, discount, purchase, purchase agreement, re-

purchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both."

4. Title 15 U.S.C. § 78j(b) provides:

 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails.

 \* \* \* \* \* \*

 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

 Title 15 U.S.C. § 78ff provides:

 "[A]ny person who willfully and knowingly makes, or causes to be made any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder . . . which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both . . . . ."

tions on or about March 15, 1977, with respect to some of the matters that are the subject of the foregoing charges in his testimony before a grand jury in violation of 18 U.S.C. § 1623 (Count Fifteen). Appellants claim that numerous errors were committed in the trial of the case. After careful consideration of each of these contentions we affirm the convictions.

The evidence, viewed favorably to the Government (as it must be at this stage, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)), shows that, although FNB suffered an operating loss in excess of $7 million during the three-month period ending March 31, 1974, it issued a financial statement on April 18, 1974, for the same first quarter of 1974 falsely representing that it had realized earnings of approximately $79,000. The financial statement was of special significance to FNB because of its anticipated influence in obtaining Government approval of a proposed FNB merger with Talcott National Corporation, a factoring and finance company, and in borrowing some $35 million from Manufacturers Hanover to be used by FNB for the purchase from Michele Sindona, the principal stockholder of FNB, of his interest in Talcott.[5]

FNB had begun to suffer substantial losses during the first three months of 1974, partly due to a decline in the market value of government securities, which had been acquired with a view to realization of a profit when interest rates declined, but which then fell in value when interest rates increased. By the end of March those losses together with others had swelled to approximately $7 million. The loss was concealed to the extent of about $5 million by falsely showing FNB-owned securities as worth more than the prices at which they should have been carried. The balance of the loss was concealed by having FNB engage in four fictitious foreign exchange transactions with European banks controlled by Sindona and his colleague Carlo Bordoni, who at Sindona's request had served as a director of the holding company, Franklin New York Corporation, which controlled FNB. These bogus transactions made it appear, by using fictitious exchange rates, that FNB had a $2.2 million unrealized profit when in fact its foreign exchange department had suffered a loss.

The false evaluation of securities was accomplished in part by backdating two transfers of government bonds from FNB's bond *trading* account to its *investment* account at inflated prices and by one such transfer of municipal and corporate securities at prices which had not been reduced to show losses in value. Securities in the bank's trading account, having been acquired for resale, were required to be carried at the lower of cost or market value, which was computed by determining the value of each security so held at the end of each month. Securities held in FNB's investment or portfolio account, on the other hand, were carried at cost with a straight line adjustment to amortize premiums or discounts. Upon transfer of a security from the bank's trading to its investment account, the bank was required to value the security at the lower of cost or market value on the date of transfer.

On March 26, 1974, Luftig, FNB's President, faced with mounting losses on the part of the bank, learned this evaluation rule from John Sadlik, FNB's chief financial officer, and asked Sadlik whether such a transfer could be backdated if instructions previously given to make the transfer had not been executed. After checking with Cornell Wright of Ernst & Ernst, FNB's independent certified public account-

---

5. FNB, with deposits at the end of 1973 of $3.7 billion and assets of $5 billion, was a subsidiary of Franklin New York Corporation, registered with the Federal Reserve Bank of New York as a bank holding company. In 1972 Sindona purchased 21.6% of the holding company's outstanding stock for $40 million. In the spring of 1973 Sindona, through a company controlled by him (Fasco) purchased 1.6 million shares of Talcott for $27 million, which he later offered to sell to FNB for a price equal to his cost plus expenses and interest, subject to approval of the Board of Governors of the Federal Reserve Bank pursuant to the Bank Holding Company Act of 1956.

ants, Sadlik responded that backdating was permissible if there was documentary verification of the earlier instructions. Luftig then advised Sadlik that he had documentation showing that instructions had been given on March 8, 1974, to transfer $100 million in United States Treasury certificates from the bank's trading to its investment account. The market value of these securities on March 11, 1974, the next business day after March 8th, had been approximately $2 million higher than their value on March 26. Sadlik thereupon arranged for Wright to visit the bank on March 27 in order to verify the documentation of the March 8th instruction which Luftig represented he had given.

On March 27, 1974, according to the testimony of Howard D. Crosse, the bank's Vice-Chairman in charge of its Investment Division, Luftig advised Crosse that if Ernst & Ernst could be convinced that the claimed instruction to transfer the securities had been given on March 8th it would not object to the bank's evaluating the securities as of March 11, 1974, and asked Crosse in substance to assist in making this possible and falsely to tell Wright that the instruction had been given. As Crosse left the room, he first noticed Gleason standing in the doorway. Gleason patted him on the shoulder and said, "Good luck." At a meeting with Wright and Sadlik later the same day, after initial documentation proved unacceptable to Ernst & Ernst, Luftig falsely stated to Wright that the instruction had been given by him earlier in March and prepared a confirmatory memorandum.

On the following day, March 28, at a meeting with Sadlik, Wright and a more senior Ernst & Ernst partner, James Russell, Crosse corroborated Luftig's fraudulent representation by falsely confirming that he had been instructed by Luftig in early March to make the transfer and had relayed the instruction to Carter. The failure to carry out the instruction was then explained to Wright and Russell by J. Michael Carter, the bank's Senior Vice-President in charge of its Investment Division, who falsely told them that the transfer had not been made because he had in effect misunderstood the earlier instruction as one to liquidate rather than to make a transfer between accounts.[6] Crosse added support to this explanation by furnishing to Ernst & Ernst his own handwritten memorandum falsely summarizing directions supposedly given to him by Luftig in early March and stating that the failure to execute them had only just been discovered.

Relying upon these false representations Ernst & Ernst did not object to the bank's March 29 transfer of the $100 million in Government securities to its investment account at March 11 market values, which enabled FNB to conceal a loss of about $2 million.

In the meantime, on March 27, 1974, Carter directed employees of the bank to transfer $62.5 million in U.S. Treasury and government agency bonds from the bank's trading account to its investment account at cost rather than at lower market prices in response to his false representation in writing that the securities had been purchased by traders without his consent when he had been instructed to keep security trading positions as low as possible. In fact, as Carter later conceded, the purchases had been authorized by him and he had not received any such instructions to the contrary prior to March 20, 1974. The effect of the transfer of $62.5 million of Government securities at cost was to conceal approximately $2 million in losses suffered by the bank during the first quarter of 1974.

The third transfer, which concealed a loss of approximately another $1 million during the first quarter, was made after Crosse, on or about April 12, 1974, was advised by Carter that municipal and corporate securities in the trading account had not been "marked to market" (i. e., evaluated at the lower of cost or market) at the end of March as was required. This information

---

6. Even assuming that an order to liquidate had been made by Luftig, Carter at trial testified it was not made until March 18, 1974.

was passed on by Crosse to Luftig who told Crosse to "transfer them to portfolio [investment account] as best you can." Crosse thereupon directed Carter to transfer the securities to the bank's investment account at March 11 market values, thus concealing an intervening decline in market value of approximately $1 million that had occurred by March 31.

The generation of approximately $2.2 million in fictitious profits from contrived foreign exchange transactions for the quarter ending March 31, 1974, was arranged by Gleason and Peter R. Shaddick, Executive Senior Vice-President of FNB and director of Franklin New York Corp., who was in charge of its International Division. Following a conference with Sindona in London on March 26, 1974, Gleason returned to New York where he advised Shaddick on March 27, 1974, that unless the foreign exchange department showed a $700,000 profit for the month of March the bank would have a loss for the quarter. After advising Gleason that the department would actually have a loss for the month of March Shaddick, upon learning from Andrew N. Garofalo, the head of the bank's foreign exchange department, that the loss would be from $1 million to $1½ million, told Garofalo that they would probably have to "pass an entry" with Bordoni that would wipe out the loss and create an apparent profit of $700,000. The term "pass an entry" meant entering into a fictitious foreign exchange contract with a European bank controlled by Sidonona and Bordoni, showing a purchase or sale of foreign currencies for future delivery at prices that would permit the bank to show a profit on the bank's earning statement.

Shaddick thereupon revealed to Gleason the loss and the steps that would be taken to reflect the fictitious $700,000 profit, receiving the latter's thanks. On March 28, after Bordoni was advised by Gleason of the foreign exchange department's predicament and agreed to help, Shaddick and Bordoni arranged for the FNB to "pass a contract" with the Amincor Bank in Zurich. Gleason was informed of the arrangement by Shaddick. Thereupon, pursuant to instructions from Shaddick, Garofalo entered into four contracts for future delivery of foreign exchange, two with the Amincor Bank and two with Banca Unione in Milan, a bank controlled by Sindona, of which Bordoni was managing director. The contracts were made at fictitiously high exchange rates unrelated to market prices, enabling the bank's foreign exchange department to show an unrealized profit of $2.2 million on the transactions and a $700,000 profit for the quarter.

The foregoing falsifications enabled FNB and its holding company to show a profit of $79,000 in their quarterly statement published and sent on April 18, 1974, to the bank's stockholders and to Manufacturers Hanover Trust Company, whereas in fact FNB had suffered a loss of over $7 million. In the meantime on April 3, 1974, FNB received from Manufacturers Hanover $30 million of the $35 million loan which the latter had obligated itself to make to FNB.

At trial the Government presented its case principally through accomplices (Crosse, Shaddick, Bordoni, Garofalo), various FNB employees, Ernst & Ernst partners Wright and Russell, Government agents, and documentary proof. Each of the three appellants testified in his own defense. Luftig denied knowledge of or participation in the making of any of the alleged false entries. He testified that on March 8, 1974, he had directed Crosse to transfer the $100 million in Government securities from the bank's trading to its investment account, ordering a liquidation of the trading account, and that when he found out on March 26 from Sadlik that the direction for the transfer had not been carried out he asked Sadlik to review the matter with Ernst & Ernst, furnishing a memorandum confirming his earlier instruction and later learning that Ernst & Ernst did not object to the transfer as of the date when the transfer order had been given. Luftig did acknowledge that on April 11, 1974, he had been advised by Crosse that a trader had failed to mark some securities to market.

Carter testified that after the bank had with his approval increased its trading position in government securities by purchasing up to $100 million in December, 1973, he was authorized by Luftig on March 18, 1974, to liquidate these securities at a loss, which he undertook to do over the following weeks; that on March 27 he was instructed by Crosse to transfer all but $100 million of the securities from the trading account to the investment account at cost, with a memorandum noting that the securities being transferred had been purchased without Carter's knowledge and consent at a time when he had been instructed to keep the bank's trading accounts as low as possible; that he gave the instruction and he signed the memorandum knowing it to be false but did it because ordered; that with respect to the March 28 meeting with Sadlik, Crosse, Russell and Wright, he could only recall stating in response to an inquiry that he had heard of a bank transferring securities from its trading account to its investment account but that this had not been done at the Chase Manhattan Bank where he had previously worked; that thereafter at Crosse's directions he had transferred the $100 million in Government securities at March 11th prices; and that in the first week of April under Crosse's orders he directed that municipal and corporate bonds be transferred to the investment account at cost although they had depreciated in value by $1 million and had not been marked to market at the end of March.

Gleason testified that his duties as Chairman were principally of a customer and public relations nature and that he did not involve himself in the day-to-day operations of the bank. He denied discussing the bank's earnings or the proposed Talcott merger with Sindona at their March 26, 1974, meeting in London, denied asking Shaddick to create a false profit through fictitious foreign exchange transactions or having any conversations about the matter, and denied having known that the bank's financial statement for the first quarter of 1974 was false.

Thus the trial of the case boiled down to a battle of credibility between each of the three defendants, on the one hand, and the Government witnesses, including accomplices, on the other, who gave diametrically opposed testimony with respect to material aspects of each of the alleged dishonest transactions forming the basis of the indictment.

## DISCUSSION

Since certain errors claimed by appellants to have been committed during the trial apply to all and some to only specific appellants, we initially consider the jointly-shared arguments. The first of these relates to the trial judge's instructions to the jury, which, including post-instruction discussions with counsel, cover some 157 trial transcript pages and were discussed extensively by the judge with counsel before the charge was given.

The Instructions

(1) *Circumstantial Evidence and Credibility*

Appellants contend that they were irreparably prejudiced by a portion of the trial judge's charge in which he sought to illustrate the nature of circumstantial evidence and the drawing of inferences by reference to a football game. The pertinent portion of the instruction is footnoted.[7] Briefly

---

7. "Sometimes judges give illustrations to jurors about the use of circumstantial evidence. A familiar one is the one where if you look out the window and see a lot of people with umbrellas, you can infer it's raining. I never know how that is helpful to a jury. You are not really trying to decide whether some weather condition exists, at least I don't know that that's a major problem in this case. But the point is that I think if you thought for a minute you would realize that this is not a novel or unusual or super human

kind of process that the lawyers and that the Court have asked you to give consideration to. Frequently in our every-day life, without calling it circumstantial evidence, we draw conclusions about what people must have done, must have thought, and must have said.
 "Here is a little illustration that may show you that this is a matter which can well be accomplished by the use of common sense and common good judgment and experience. This is an illustration that quite obviously

summarized, it advised the jury that on the basis of common sense and experience a jury could infer from a team's performance on the field what previous instructions and training had been given by the coach and what had been done by the players in preparation for the game, even though the jury had not been present in the locker room or on the training field and hence had not witnessed the instructions and training.

■ Unquestionably the example used in the instruction was ill-conceived, confusing and inappropriate. Since the three defendants were top officers of the FNB, the example exposed them to the risk that the jury might interpret it as implying that they could be considered to have played the role of "football coaches" who had from behind the scenes directed bank officials or employees on the "team" (e. g., Crosse, Shaddick, Garofalo, etc.) to commit the alleged crimes. As we thought we had made clear in *United States v. Dizdar,* 581 F.2d 1031 (2d Cir. 1978), the choice of an example too close or analogous to the facts of the case on trial is likely to be more prejudicial than "helpful" and is quite unnecessary when other clearly non-prejudicial examples are available.

Moreover, the example was inaccurate. Experience demonstrates that one cannot logically or reasonably infer that players' actions on a football field are necessarily or even probably the result of a coach's di-

rections or training. It hardly requires an expert to appreciate that some "plays," "passes," "runs," "penalties" and "injuries," see n. 7 *supra,* may arise from circumstances unrelated to a coach's training or instructions, such as a quarterback's inspiration of the moment or sheer luck or happenstance. Well-trained and coached teams have been known to perform poorly and vice-versa. In effect, therefore, the example could be viewed as an invitation to speculate rather than to use logic and reason in drawing inferences from circumstantial evidence.

Notwithstanding these weaknesses in the example, we are not persuaded that it calls for a reversal in this case. When the entire charge on the subject is viewed in context, as it must be, see *United States v. Hanlon,* 548 F.2d 1096, 1101 (2d Cir. 1977); *United States v. Guillette,* 547 F.2d 743, 750 (2d Cir. 1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *United States v. Gentile,* 530 F.2d 461, 469 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976), we do not view the example as having any serious prejudicial effect. The jury was adequately advised of the nature of circumstantial evidence. It was repeatedly told to use "common sense," "common experience" and "common good judgment" in drawing inferences from facts found by them and that inferences depended on the jury's acting "logically and reasonably." Moreover, before launching

---

has nothing to do with the present case. Let's assume that you attend a football game. You see the players and the teams performing certain plays. You observe on the field many details about how well or how poorly the teams perform, whether there are a lot of passes or a lot of runs, whether there are many penalties or few penalties, whether there are many injuries or few injuries, whatever details go on before you.

"Now, on the basis of common experience and common sense, and on the basis of whatever information you know about football and about your observing this game, you can logically and reasonably infer some things about what people did and said and thought before that game and in preparation for that game, although you were not present in the locker room or on the training field and although no witnesses come to tell you what went on. You can infer that—there are some

things that you will be able to infer about whether the coach gave good or bad training, what instructions he gave, what he must have said in substance, what acts were done by the coach and the players in preparation for that game. There will be some things that a person in the audience could reasonably and logically infer and know beyond any doubt; there will be some things that they could not reasonably and logically infer beyond a doubt. But that kind of thought process, if anybody went through it, would be something which would not be a super human effort or bizarre or unusual.

"Now, you're being asked in this case to not only evaluate the direct evidence but to determine what the circumstantial evidence shows as to what various people did, said, and thought. The question for you is: What you can infer and what you cannot reasonably infer?"

into the "football coach" example the court carefully stated "This is an illustration that quite obviously has nothing to do with the present case." We believe it would be denigrating the intelligence of the average jury to conclude that it would forsake its own common sense and experience for the suggestions implied in the court's ill-conceived "example."

Turning to the court's instructions on the subject of credibility, we recognize that the witnesses' credibility was a central issue and played a decisive role in the case, in view of the diametrically conflicting testimony of the Government's witnesses, on the one hand, and the defendants, on the other, with respect to crucial material facts. Appellants contend that with this background the court's charge precluded a balanced assessment of the witnesses' credibility because it failed adequately to warn of the inherently suspect nature of the testimony of the accomplices called by the Government, some of whom had admitted to a series of frauds, perjury and other criminal acts, and others of whom had pleaded guilty pursuant to plea bargains and were awaiting sentence, and because it exaggerated the reasons for distrusting a defendant's testimony. We disagree.

■ Unquestionably, it is the court's duty, in instructing a jury on the subject of witnesses' credibility, to give balanced instructions. Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators, e. g., *United States v. Santana*, 503 F.2d 710, 715–16 (2d Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 632, 42 L.Ed.2d 649 (1974), those who have made plea bargains or are awaiting sentence, see, e. g., *United States v. Corcione*, 592 F.2d 111, 116–17 (2d Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794 (1979); *United States v. Projansky*, 465 F.2d 123, 136 (2d Cir.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); *Good v. United States*, 410 F.2d 1217, 1221 (5th Cir. 1969), *cert. denied*, 397 U.S. 1002, 90 S.Ct. 1131, 25 L.Ed.2d 413 (1970), those who have been granted immunity, *United States v. DeLoach*, 174 U.S.App.D.C. 138, 530 F.2d 990, 994 & n. 5 (D.C.Cir.1975), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976), and defendants, *United States v. Rucker*, 586 F.2d 899, 903–04 (2d Cir. 1978); *United States v. Martin*, 525 F.2d 703, 707 & n. 3 (2d Cir. 1975), it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part. *United States v. Vega*, 589 F.2d 1147, 1154 (2d Cir. 1978). In short, the court should not emphasize the suspect nature of the testimony of certain witnesses without pointing out that they may be believed. Although a trial judge has the right to comment on credibility of specific witnesses, this right is limited and its exercise is appropriate only when necessary to assist the jury. *Quercia v. United States*, 289 U.S. 466, 469–71, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). Confidence in our jury system leads us to leave credibility solely to the jury which, as the conscience of the community, is expected to act with sound judgment.

■ Applying these basic principles here we conclude that Judge Griesa's credibility charge, viewed in its entirety, satisfied all legal requirements and was neither unfair to the appellants nor weighted in favor of the Government's witnesses. The court pointed out that the Government is frequently out of necessity required to rely on participants, accomplices, and persons who have committed crimes including perjury, as witnesses and that "you must view these witnesses with particular caution and scrutinize them with particular care." Similarly, although Judge Griesa noted that a defendant "has a deep personal interest in the result of this prosecution" and "the greatest kind of stake in its outcome" which "creates, at least potentially, a motive for false testimony" and "is of a character possessed by no other witness," which has been the standard language used by district judges for many years, he continued with the same boiler-plate language to the effect that "it by no means follows that simply because a person has a vital interest in the end result

of a case he is not capable of telling a truthful, candid, and straight-forward story" and that it was for the jury, after weighing these factors, and giving "the most careful and fair consideration to the testimony of each defendant and to the factors which . . . could weigh for or against its credibility" to determine its credibility. Thus the instructions were balanced and did not preclude the jurors from making a fair assessment of the credibility of the witnesses who had appeared before them.

## (2) Conspiracy

Appellants contend that since the alleged conspiracy was one to engage in fraudulent falsification of entries (in violation of 18 U.S.C. §§ 1005, 1014 and 15 U.S.C. §§ 78j(b), 78ff) by means of two distinct types of transactions (i. e., false evaluation of securities and fictitious foreign exchange transactions), the trial judge was not only required to instruct the jury regarding the entire alleged plan or scheme, including all means to be used to effectuate it, but to advise the jury that no defendant could be convicted unless he comprehended its full scope and knew of every means which the jury found to have been employed in furtherance of the conspiracy. They cite *United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938), for this proposition. Failure to give such a charge, they claim, allowed the jury to convict defendants who may not have been knowing parties to the entire scheme.

The scope of the conspiracy alleged in the present case, while rather broad and encompassing conduct that would violate several laws, was by the time of trial sufficiently defined to be clearly comprehensible and if proven, to warrant a conviction for violation of 18 U.S.C. § 371.

■ The objective of the alleged conspiracy was to falsify FNB's operating statement for the first quarter of 1974 so that the bank would appear to have made a profit when in fact it had suffered a loss of over $7 million, and thereby to deceive anybody who might normally be expected to rely on the statement (e. g., federal authorities, lenders, stockholders, etc.) as an honest and accurate representation of the bank's operations for the quarter. The alleged motives, which were relevant but not elements of the crime and need not be proven, included the desire to gain approval of the proposed Talcott merger by Federal bank authorities. Two principal means were allegedly used to accomplish the goal of the conspiracy: (1) false evaluation of securities, and (2) fictitious foreign exchange transactions.

■ Review of a few basic principles of conspiracy law is essential to determine whether the charge here was sufficient. To be convicted as a member of a conspiracy, a defendant need not know every objective of the conspiracy, *United States v. DiGeronimo*, 598 F.2d 746, 755 (2d Cir. 1979); *United States v. Bernstein*, 533 F.2d 775, 793–94 & n. 12 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), every detail of its operation or means employed to achieve the agreed-upon criminal objective, *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977), or even the identity of every co-conspirator, *United States v. Sperling*, 506 F.2d 1323, 1340 (2d Cir. 1974); *United States v. Sisca*, 503 F.2d 1337, 1345 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). There must, however, be agreement on the "essential nature of the plan," *Blumenthal v. United States, supra,* and on the "kind of criminal conduct . . . in fact contemplated." *United States v. Gallishaw*, 428 F.2d 760, 763 n. 1 (2d Cir. 1970). See also *United States v. Rosenblatt, supra,* 554 F.2d at 38–39. In addition

"a person may be held to intend that which is the anticipated consequence of a particular action to which he agrees, when that action is unreasonable in view of that consequence."

*Developments in the Law—Conspiracy*, 72 Harv.L.Rev. 920, 932 (1959). See also 1

Wharton's Criminal Law and Procedure § 90, at 197 (1957). In short, the conspirator must agree to and participate in a scheme which he knows to have an illegal objective. If, in the course of the conspiracy, there occur other illegal acts not specifically contemplated by an individual conspirator but reasonably akin to the anticipated illegality and in furtherance or in consequence of the scheme, the conspirator may not on that account escape liability for participation in the conspiracy.

■■■ With these principles in mind we are satisfied that Judge Griesa's conspiracy charge was sufficiently clear to provide the jury with the basic legal principles it needed to determine whether there was a conspiracy in violation of 18 U.S.C. § 371 and whether each defendant joined it with knowledge of its illegal objective. At the outset he accurately summarized Count One as charging generally that the three defendants "conspired to falsify the first-quarter 1974 financial statement of the Franklin National Bank, for various purposes." Having thus described the general goal, Judge Griesa described the various federal offenses which were alleged to have been committed in the course of the conspiracy and correctly noted that in order to convict a defendant the jury need not find that he "conspired to achieve all of the objects alleged or to violate all of the statutes or rules referred to." (A.67).

The court's next step, stated as being in the interest of simplicity, was to select one of the alleged objects of the conspiracy—violation of 18 U.S.C. § 1005, which makes it a crime for an officer or director of a national bank to make a false entry in a report or statement of the bank with the intent to defraud—as the vehicle for explaining the basic elements that must be proved beyond a reasonable doubt to establish the alleged conspiracy. The court properly instructed that there must be proof of an agreement between two or more persons "to make a false entry, namely, the $79,000 net income item in the statement of earn-

ings of the Franklin National Bank for the first quarter of 1974, with the purpose of defrauding or deceiving;" that "the particular defendant you are considering, knowingly joined in the conspiracy;" and "that at least one of the conspirators committed at least one overt act charged in the indictment." The jury was then accurately instructed that the FNB was a national bank within the meaning of § 1005 and that the $79,000 item in its first quarter statement of earnings was an "entry," as were the other figures in the quarterly statement including the earnings figures of $1,301,000 for the trading account and $2,454,000 for the foreign exchange trading account.

After defining accurately the term "false entry," "defraud," and "intent to deceive" as used in the statute and indictment, the district judge focused on the two means charged in Paragraphs 5 and 6 of Count One of the indictment as those whereby the conspiracy was allegedly to be effectuated, i. e., by concealment of depreciation in the value of securities in the trading account and by fictitious foreign exchange contracts to create the false appearance of profits, pointing out that the jury was not required to find that both means had been used in order to convict the defendants, and that it might convict all three defendants if it found they had conspired to falsify the financial statement and used either or both means. This instruction was qualified by the statement that Carter could not be found guilty if the jury found that the conspiracy was solely to falsify through foreign exchange contracts. The reason for this qualification and the court's dismissal of the Count Three charge (fictitious foreign exchange contracts) against Carter was that there was no evidence that he had anything to do with such contracts. Lastly, the court properly charged the jury that to convict on the conspiracy count it must find a single conspiracy of the type alleged. It also advised the jury that if it found two separate independent conspiracies it must acquit.[8]

8. This instruction was more favorable to the defendants than the law required, since it is

subject to the qualification that where there is proof of the conspiracy charged in an indict-

■ Thus the conspiracy instructions were adequate and conformed to basic principles of conspiracy law as they have evolved. As long as the jury found one conspiracy to falsify the bank's books in order to produce a false income statement for the first quarter of 1974 and that each defendant played a part in that conspiracy it was unnecessary for the Government to establish that each defendant agreed to each of unlawful acts or means that might be used to achieve that goal.

It hardly necessitated any great mental gymnastics for any reasonable person logically to conclude in the present case that when a bank officer participated in the falsification of bank entries designed to hide a huge depreciation in the value of the bank's assets he did so for the purpose of enabling the bank to falsify its quarterly financial statement, not for his own edification or to alter the bank's internal bookkeeping system but to mislead others who would normally rely upon the statement as a true representation of the bank's financial picture. Any major participant aware of the ultimate objective and its achievement through one type of false entry could also reasonably foresee that other types of entry falsification, such as fictitious foreign exchange transactions, might well be used to achieve that goal. There was an abundance of evidence from which the jury could infer that each of the appellants agreed to the general objective of fraudulently falsifying FNB's first quarter 1974 earnings statement.

Our earlier decisions in *United States v. Peoni, supra,* and *United States v. Falcone,* 109 F.2d 579 (2d Cir. 1939), *affd.,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), relied upon by appellants, do not require a contrary conclusion. In each of those cases there was simply no evidence from which a jury could infer an agreement to which the defendant could have been a party or that he willfully or knowingly participated in the alleged conspiracy. Here, on the other hand, there was ample evidence to permit a

jury to infer a general agreement on the part of FNB's top officials to falsify its financial statement for the first quarter of 1974 and that each played some part in it.

No defendant here was held liable beyond "the fair import of the concerted purpose or agreement as he understands it." *United States v. Peoni, supra,* 100 F.2d at 403. The appellants would have us read this broadly, to mean that to be a conspirator, one must have full knowledge of each facet of the conspiracy. We have, however, read *Peoni* and *Falcone* more narrowly than this, see, e. g., *United States v. Calabro,* 467 F.2d 973, 981 (2d Cir. 1972), *cert. denied,* 410 U.S. 926, 96 S.Ct. 1357, 35 L.Ed.2d 587 (1973); *United States v. Tramaglino,* 197 F.2d 928, 930 (2d Cir.), *cert. denied,* 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952), and we do not believe they contradict our statement above of the legal principles involved here.

■ Luftig contends that the court erred in failing to instruct the jury, as it did with respect to Carter, that if the jury found a conspiracy to falsify FNB's quarterly earnings statement solely by fictitious foreign exchange transactions it should not convict him. We doubt that Carter, who did not participate in or know of the foreign exchange transactions, was entitled to this instruction, since there was evidence of his participation in the broad conspiracy to falsify FNB's quarterly earnings statement and, as we stated above, it was unnecessary for the Government to prove that he knew of each means used to carry it out. Moreover, even if there was error in denying Luftig the charge, the error was harmless. Since the jury convicted Carter, it had to have found that the conspiracy was not carried out solely by fictitious foreign exchange transactions. Thus Luftig's conviction could not have been based on a conspiracy carried out solely by that means.

In any event, the jury found all defendants guilty of falsification by concealment of the depreciation in value of the securities in its trading account (Count Two) and Luftig guilty of perjuring himself before the

ment, a finding of other conspiracies would not mandate acquittal. *United States v. Tramunti,*

513 F.2d 1087, 1108 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

grand jury when he swore that he had in early March ordered the transfer of the $100 million from the bank's trading account to its investment account. Thus there was ample evidence to support a finding of conspiracy to falsify the bank's earnings statement in which Luftig played a major part.

### (3) Pinkerton Charge

The Supreme Court in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), held that a conspirator may be found guilty of a substantive offense committed by a co-conspirator in furtherance of and as part of an alleged conspiracy even though he personally did not commit the acts constituting the substantive crime itself. In accordance with *Pinkerton* Judge Griesa instructed the jury that if it found that a defendant was a member of the conspiracy alleged in Count One but did not commit the acts constituting one of the alleged substantive crimes (e. g., violation of 18 U.S.C. §§ 1005 (Count Two), 1014 (Count Three), or § 10(b) of the Securities Exchange Act), it might nevertheless find him guilty of a substantive crime committed by a co-conspirator in furtherance of the conspiracy and as part of it, provided the conduct "was within the scope of the conspiracy and a foreseeable consequence of it," since the defendant committing the substantive crime, like a partner, might then be treated as an agent of the other members of the conspiracy.

Appellants contend that this instruction was erroneous. First they argue that no *Pinkerton* charge at all should have been given because there was insufficient evidence of the existence of a general conspiracy, in furtherance of which the substantive offenses were committed, to warrant such a charge, cf. *United States v. Sperling, supra*, 506 F.2d at 1341–42. We disagree.

There was ample evidence independent of the substantive crimes themselves from which the jury could find beyond a reasonable doubt that the top officers of FNB joined in a plan to falsify its first quarter earnings statements so that it would appear to show a profit and that to accomplish the unlawful objective some engaged in criminal acts that were either known or should have been reasonably foreseeable to the others. Although there was little evidence of Luftig's knowledge of or participation in the fictitious foreign exchange transactions or of Gleason's participation in the false evaluation of the bank's trading account securities, there was ample proof, crediting as we must the testimony of Crosse and Shaddick, that each defendant in his own way joined in a scheme to falsify the bank's earnings statement. This was sufficient to permit the giving of a *Pinkerton* charge with respect to the reasonably foreseeable crimes that might be committed by fellow conspirators in furtherance of that scheme. Indeed, the obvious purpose of falsifying the bank's earnings statement was to commit frauds.[9]

Appellants' second objection is that the court's *Pinkerton* charge permitted the jury to find them guilty of substantive crimes which were not part of the conspiracy. We disagree.

When Judge Griesa explained the conspiracy count to the jury, he used the § 1005 violation, which was one of the alleged objectives of the conspiracy, as an example. He did not go through the § 1014 and Rule 10b–5 counts at that time; rather he stated that he had not stricken the others, but was trying to simplify his explanation. However, when it came time to explain the *Pinkerton* rule, the court said:

"And remembering that the conspiracy count relates to 1005, and of course some of these substantive counts relate to other statutes—1014, Section 10(b) of the

9. Although the court dismissed Count Three against Carter on the ground that he had not personally participated in the foreign exchange transactions, this was not required since, upon the evidence before it, the jury could find that Carter joined the conspiracy to falsify FNB's first quarter 1974 financial statement and could reasonably anticipate that his partners in crime might commit other criminal acts, including use of fictitious foreign exchange transactions, to misrepresent the bank's earnings.

Exchange Act, and so forth—but nevertheless, if you have found any defendant guilty under Count one [the conspiracy count], then you are obliged to reconsider his guilt on the substantive count you are considering."

Appellants argue that this statement permitted the jury, once it found a conspiracy to violate one statutory provision, to use *Pinkerton* to hold a conspirator liable for violations of other provisions not among the objects of the conspiracy and not done in furtherance of the conspiracy.

A diligent reading of the charge, however, reveals that Judge Griesa properly instructed the jury. He followed the passage quoted above with the instruction that in order to convict:

"You must find that the crime charged in the substantive count was committed by co-conspirator and that it was committed during and in furtherance of the conspiracy charged in the conspiracy count. You must find that the crime charged in the substantive count was within the scope of the conspiracy and a foreseeable consequence of the unlawful agreement."

As already noted, he had previously instructed the jury that the alleged objective of the conspiracy was to falsify FNB's first quarter 1974 financial statement by making a false entry to the effect that it had a net income of $79,000 when it had in fact suffered losses, all with a view to defrauding others. Thus the court's *Pinkerton* charge was in accordance with the principles enunciated by the Supreme Court, see *Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949), and by this court, see *United States v. Molina*, 581 F.2d 56, 60–61 (2d Cir. 1978). The instruction was therefore sufficient, and there was ample evidence from which the jury could have concluded that the substantive violations were committed in furtherance of the conspiracy charged, if indeed the jury found it necessary to reach the question of *Pinkerton* liability at all.

### (4) *Aiding and Abetting*

The indictment charged and the court gave instructions regarding liability of the defendants for "aiding and abetting" or "causing" the various crimes, pursuant to 18 U.S.C. § 2.[10] Appellants argue that the court erred in failing to instruct the jury that before it might find any defendant guilty as an aider and abettor the principal must be identified, or in failing to identify the principal himself.

■ We have held that under 18 U.S.C. § 2(a) a person charged as an aider and abettor "cannot be found guilty . . . unless a principal whom he has aided and abetted committed the criminal act." *United States v. Bernstein*, 533 F.2d 775, 799 (2d Cir. 1976). See also *United States v. Erb*, 543 F.2d 438, 446 (2d Cir.), *cert. denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976). Under 18 U.S.C. § 2(b) a person who causes an innocent party to commit an act which, if done with the requisite intent, would constitute an offense may be found guilty as a principal even though he personally did not commit the criminal act.[11]

■ In the present case there was sufficient evidence to permit the jury to find that at least one defendant or co-conspirator participated in each of the alleged criminal acts, either as a principal, an aider and abettor, or under *Pinkerton* as a co-conspirator who could reasonably foresee that the substantive crimes might be committed by fellow conspirators in furtherance of the conspiracy.

---

10. 18 U.S.C. § 2 provides:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

11. We are not confronted here with a case where any defendant was legally incapable of committing an alleged offense. See *United States v. Ruffin*, 613 F.2d 408, (2d Cir.); *United States v. Lester*, 363 F.2d 68, 72–73 (6th Cir. 1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967).

Absent some indication that there was a failure to prove that a defendant committed one of the alleged criminal acts or participated knowingly in the commission of such an act by another, we believe that the court's refusal to require the jury first to identify the principals and then to identify the aiders and abettors was proper. Several other circuits have held that there is no such requirement, see *United States v. Staten*, 189 U.S.App.D.C. 100, 109, 581 F.2d 878, 887 (D.C.Cir. 1978); *United States v. Bryan*, 483 F.2d 88, 93–94 (3d Cir. 1973) (en banc); *United States v. Austin*, 462 F.2d 724, 731 (10th Cir.), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972); *Feldstein v. United States*, 429 F.2d 1092, 1095 (9th Cir.), *cert. denied*, 400 U.S. 920 (1970), and we agree. It is sufficient that the court instruct the jury that in order to convict under 18 U.S.C. § 2 the acts must have been committed by someone. Judge Griesa's charge was entirely adequate in this respect, and there was sufficient evidence to permit the jury to find that at least one defendant or co-conspirator acted as principal in the commission of each of the crimes charged.[12]

**(5) *Potential Adverse Effect on Bank Depositor-Jurors***

 Appellants contend that by implying in his charge that bank depositors were victims of the crimes alleged, Judge Griesa destroyed appellants' Sixth Amendment right to an impartial jury, since most of the jurors were undoubtedly bank depositors and one had been a depositor in FNB. The claim is so speculative as to border on the frivolous.

In the first place, the record gives no indication that any juror had been an FNB depositor. Regardless of this side-issue, the court's instruction did not suggest that depositors were victimized. Judge Griesa quite properly stated that the term "any other company or body politic or corporate or any individual person," as used in § 1005, "obviously includes persons who are depositors and other customers of the bank, borrowers from the bank; it also includes other banks which lend money to the particular bank."

We find nothing inflammatory or unfair about this accurate description of the type of persons whom the statute was designed to protect. Nor is there any indication that any defendant was prejudiced or likely to have been prejudiced by the description, which must be shown for reversal. *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970). Cf. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Tramunti*, 513 F.2d 1087, 1114 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

Evidentiary Rulings

**(1) *Prior Similar Conduct by Crosse***

 Luftig contends that the district court erred in refusing to permit him to offer certain evidence tending to establish his innocence of any false evaluation of FNB's securities and unduly restricted his cross-examination of Crosse on the same subject. We disagree.

As evidence of Luftig's participation in the false evaluation of bank securities by backdating the transfer of some from the bank's trading to its investment account in March, 1974, and by failing to "mark to market" other securities in the trading account, the Government introduced Crosse's testimony regarding Luftig's instructions. In his defense Luftig sought to introduce a series of eight items, including evidence that during the period 1971–74 Crosse, both prior to and after Luftig's joining FNB, had without Luftig's knowledge repeatedly transferred securities from the bank's trading to its investment account without proper evaluation and had failed to reevaluate or "mark to market" securities in the trading account or establish adequate depreciation reserves, thus concealing hundreds of thousands of dollars of deprecia-

---

12. We are not here confronted with a case where a possible principal was acquitted. See *United States v. Ruffin*, 613 F.2d 408, (2d Cir.);

*United States v. Standefer*, 610 F.2d 1076 (3d Cir. 1979).

tion. The purpose of the offer, of course, was to try to show that in March, 1974, as on prior occasions, Crosse had acted on his own without Luftig's knowledge and that Crosse's testimony implicating Luftig was incredible.

Judge Griesa restricted Luftig to two items, one a transfer at Crosse's discretion on September 20, 1973, of $37.85 million of securities at cost from FNB's trading to its investment account, which allegedly concealed more than $695,000 of depreciation and the other a failure in July, 1973, to "mark to market" securities in four trading accounts or to establish adequate reserves for some $3 million in losses, which were concealed from . Crosse's superiors. Evidence regarding the other six items was excluded on the ground that whatever probative value the evidence might have was outweighed by the danger of confusing the jury regarding the issues on trial by diverting its attention to collateral issues.

Upon this review the propriety of the district court's ruling must be tested by the standard of whether the exclusion of the evidence constituted a clear abuse of discretion. *Hamling v. United States*, 418 U.S. 87, 124–25, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Corr*, 543 F.2d 1042, 1051 (2d Cir. 1976). Given the circumstances before the trial judge, we find no such abuse.

A clear showing that Crosse had engaged in prior similar misconduct without Luftig's knowledge would have some probative value (though far from conclusive) on the issue of whether he later acted under Luftig's directions in March and April 1974. See, e. g., *United States v. Matot*, 146 F.2d 197, 198 (2d Cir. 1944) (exclusion of evidence of offer by one charged with fraud based on overdrafts to make good on deficiencies held error); *United States v. Platt*, 435 F.2d 789, 793 (2d Cir. 1970). Crosse's engagement in earlier wrongdoing, on the other hand, would not preclude a finding that Luftig and he joined together in the later misconduct, with Luftig willing to take the lead

for obvious reasons. Moreover, where such proof, though of some relevance, may lead to confusing and time-consuming disputes with respect to collateral issues the trial judge may properly reject or limit it. *United States v. King*, 560 F.2d 122, 134 (2d Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); Fed.R.Evid. 403. This appears to have been the situation confronting the district court in this case.

Even with respect to the September 20, 1973, transfer of securities, serious collateral issues were raised regarding the extent of Crosse's involvement in the transfer and whether it was made by lesser employees (possibly by mistake), possibly without his knowledge. Moreover, the Government contended that some purchases of securities ostensibly for the bank's trading account were in fact made from the outset for the investment account, which had no traders of its own, using trading account traders and then transferring acquisitions to the investment account. If this were established, the transfer from trading to investment at cost might have been justified or excused as a mistake. Lastly, Carter vigorously opposed introduction of evidence as to the earlier security transfers and failures to "mark to market" since they might reflect upon his honesty as vice-president in charge.

Faced with these complexities, which could lead to "trials within the trial," Judge Griesa—sensibly in our view—limited Luftig to two of the earlier examples, permitting evidence as to the September, 1973, transfer on the ground that the matter had been opened up by the Government on its examination of Crosse.[13] We find no abuse of discretion in this ruling.

(2) *The May 12 Press Release*

 Luftig next argues that the court erred in refusing to permit him to testify that on May 12, 1974, several weeks after the principal fraudulent conduct which was the subject of the indictment, he opposed

---

13. Even as to the September, 1973, transfer the record discussion regarding the side issues created by its introduction covered almost 50 pages of transcript.

the issuance by FNB of a press release, favored by Sindona, which failed to disclose certain hidden foreign exchange transactions concededly "unrelated" to the transactions that were the subject of the indictment. We find no abuse of discretion in this ruling which properly avoided getting into more complicated collateral issues with respect to other differences that developed later between Luftig and Sindona, leading to the former's being asked to resign. At most the evidence would show a disagreement between the two having nothing to do with the criminal conduct alleged in the indictment. Further evidence of Luftig's differences with Sindona over unrelated matters would be of doubtful probative value with respect to the issues on trial and could confuse the jury.[14]

### (3) *Cross-Examination of Crosse*

 Similarly we find no merit in Luftig's claim that it was error to bar him from bringing out that Crosse had vigorously opposed before FNB's board of directors a management proposal to disband the bank's municipal dealer department. Luftig argues that the evidence indicates unlikelihood that Crosse would have done Luftig's bidding to falsely value $100 million of the bank's securities by backdating to March 11, 1974, their transfer from its trading to its investment account. Here again, aside from the tenuousness of the inference sought to be drawn and the fact that the subject was beyond the scope of cross-examination, since it had not been opened up on direct, see Fed.R.Evid. 611(b), to permit such questions could open up a flood of evidence regarding a possibly confusing collateral issue, with the Government seeking to establish dissimilarities or reasons why Crosse would act differently under one circumstance than under the other. We find no abuse of discretion in the judge's precluding cross-examination of Crosse on this subject matter. See *United States v. Carr,* 584 F.2d 612, 617 (2d Cir. 1978).

### (4) *Testimony Challenged as Hearsay*

 Appellant Luftig argues that the court erred in admitting testimony by Cornell Wright, an Ernst & Ernst partner, that on May 17, 1974, he was told by Carter that the March 27, 1974, transfer at cost of $62.5 million of U. S. Government agency securities had been "ordered by someone superior to Howard Crosse." Luftig contends that the statement was post-conspiracy, narrative hearsay as to him, see *United States v. Birnbaum,* 337 F.2d 490, 494–95 (2d Cir. 1964). We disagree.

There was sufficient independent evidence to justify a finding by the trial judge that the conspiracy was still alive on May 17 and that Luftig and Carter were participants. Carter's quoted statement was therefore admissible against Luftig under Fed.R.Evid. 801(d)(2)(E) as a statement in furtherance of it designed to allay suspicion on Wright's part regarding the propriety of the March transfer. *United States v. Ruggiero,* 472 F.2d 599, 607 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973); *United States v. Geaney,* 417 F.2d 1116 (2d Cir. 1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

 The testimony of John Sadlik, the bank's chief financial officer, to the effect that after Luftig had left FNB Sadlik had ordered Carter to reverse the March, 1974, transfer from the bank's trading to its investment account and to revise the March 31 quarterly financial statement is also objected to by Luftig as hearsay. However, the underlying corporate memorandum and entry confirming the instruction was properly admitted as a record made in the regular course of business, Fed.R.Evid. 803(6), and Sadlik's testimony was admissible to explain the background of the document. In any event, assuming the admission of the memorandum was error, it was harmless.

---

14. Luftig was permitted to testify that beginning on May 6, 1974, despite Sindona's strong opposition, he actively supported a merger of FNB with Manufacturers Hanover, and that he (Luftig) requested an FBI investigation into the bank's non-disclosure of certain unrelated foreign exchange transactions.

Claims of Prosecutorial Misconduct

(1) *Alleged Violation of F.R.Cr.P. 16(a) by Non-Disclosure of Statements*

Appellant Gleason, formerly FNB's chief executive officer, argues that the Government violated F.R.Cr.P. 16(a)(1)(A) by failing to disclose before trial a letter written by him on August 30, 1965, to FNB's then Chairman, years before the events here in issue, and notations in his handwriting on various financial statements and agenda of FNB board meetings during the period from December 20, 1973, to March 28, 1974, after Gleason had himself become Chairman. We disagree.

The issue arose when the Government sought to use the foregoing material in its cross-examination of Gleason, who had testified on direct that following the creation in November, 1973, of the "Office of Chairman" at the bank (consisting of himself, Shaddick and Luftig) he (Gleason) ceased to be involved in the day-to-day activities of the bank. He testified that thereafter he devoted himself primarily to public relations activities on behalf of FNB, visiting important domestic customers and cultivating its foreign relationships with a view to improving its image, while Shaddick supervised the bank's international operations and Luftig its domestic operations. He denied being privy to any instructions by Luftig to Crosse to falsify the value of the bank's securities by backdating their transfer and denied asking Shaddick to create false profits by fictitious foreign exchange transactions. Thus Gleason sought to divorce himself from sufficient responsibility for the bank's earnings' statements to have been involved in the falsification of its earnings' report for the first quarter of 1974.

On cross-examination the Government, in an effort to impeach Gleason's denials and his posture of ignorance, confronted him with the August 1965 letter in which, in advocating himself for the presidency of the bank, he had urged that the bank's head should closely follow its earnings. He was also faced with his various handwritten notations on FNB Board agendas and earnings statements in early 1974 to indicate that he had been keeping himself advised of the bank's financial operations in some detail at the very time when, according to his direct testimony, he had been ignorant of these essential financial facts.

Rule 16(a) obligates the Government upon request to permit a defendant to inspect "any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government." The rule, of course, is intended to enable a defendant to obtain prior to trial any of his own statements relevant to the crime charged against him so that he will be able to prepare properly to face the evidence that may be introduced against him at trial.

Gleason's 1965 letter, which predated by almost 10 years the events in issue, and his mere notations on agenda and financial statements, were hardly "relevant" to the crimes charged against him; they did not tend to show that he had participated in any falsification of the bank's earnings statement for the first quarter of 1974. The fact that a bank officer once believed that its president should follow its earnings statements does not implicate him in any dishonest underlying transaction that is not in the bank's earnings reports. The Government was not therefore required by Rule 16(a) to disclose the documents because they were not "relevant . . . statements" within the meaning of that Rule. The documents became relevant for impeachment purposes only after Gleason testified on direct that he did not personally keep acquainted with the bank's day-to-day operations, thus seeking to corroborate his denials of involvement in the transactions at issue. See *United States v. Hodges,* 480 F.2d 229, 232–33 (10th Cir. 1973); *United States v. Skillman,* 442 F.2d 542, 550 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

The Government's failure to turn over the documents prior to trial, moreover, did not prevent Gleason from preparing to meet the charges against him. The documents were at all times in the custody of the Federal Deposit Insurance Corporation (FDIC) as liquidator of FNB and were as available to Gleason as they were to the Government, which obtained them on the eve of trial, approximately November 27, 1978. Although the FNB records in custody of the FDIC were voluminous,[15] Gleason had long before trial been provided with an inventory of them and in preparing a strategy of ignorance should have known that Board minutes and earnings statements to which he might have been exposed would be important and should, with the aid of the inventory, have been extracted from the mass for examination.

 The Government is not obligated by Rule 16(a) to anticipate every possible defense, assume what the defendant's trial testimony (if he decides to testify) will be, and then furnish him with otherwise irrelevant material that might conflict with his testimony. With respect to such material, if any obligation to disclose existed under Rule 16(a) it was satisfied by making the underlying files available to the defendant prior to trial. *United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31, 74 n. 80, 76 n. 93 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (White House files); *United States v. Cirillo*, 499 F.2d 872, 882 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (wiretaps). From that point on it was Gleason's task to prepare his defense.

 Lastly, Gleason has failed to show any legally cognizable prejudice as a result of the failure to have the documents in advance of trial. It is not suggested that if he had received them he would have decided not to testify. Indeed, no request was made for a continuance to permit preparation of a more plausible reconciliation between the documents and his direct testimony.

### (2) *Alleged Improper Rebuttal Summation*

Gleason argues that he was denied a fair trial because the prosecutor, in his rebuttal summation pursuant to F.R.Cr.P. 29.1, introduced prejudicial new matter and the court refused to give a curative instruction.

The controversy arose out of the apparent absence from the record of any explanation or basis for the $700,000 profit figure which Gleason told Shaddick that the bank's foreign exchange department must have for the month of March, 1974, if FNB was to avoid showing a loss for the first quarter. During his main summation the prosecutor commented sardonically that the defendants would probably claim the $700,000 figure was dreamt up by Shaddick on the beaches of Acapulco. Accepting this suggestion, Gleason's counsel in his summation then argued that the figure was indeed the product of Shaddick's imagination. The prosecutor responded in his rebuttal summation with an adding machine tape which totalled losses from the liquidation of government securities during the period March 15–27, 1974, at $699,431.86, almost precisely the same as the figure of $700,000 that had been used by Gleason in stating the profit needs of the foreign exchange department.

Gleason contends that it was unfair and improper to introduce such new material in a reply summation, citing *Moore v. United States*, 120 U.S.App.D.C. 173, 344 F.2d 558, 560 (D.C.Cir. 1965), and *United States v. Rubinson*, 543 F.2d 951, 956–66 (2d Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976), to which the Government replies that the material was not new but a response, based entirely on exhibits already in evidence, negating Gleason's claim in his counsel's summation that Shaddick invented the $700,000 figure.

---

**15.** Gleason's counsel did visit the FDIC depository, but only once, and may have attended a deposition in a civil suit, *In re Franklin National Bank & Securities Litigation*, MDL 196 (E.D. N.Y.), at which the documents may have been used in the examination of Gleason.

Had Gleason's summation been the first occasion for the latter argument, the Government's reply might be persuasive, because it could then argue that it had no intention of referring to the computation unless and until Gleason challenged the source of the $700,000 figure. Fairness would dictate that a copy be furnished to Gleason well enough in advance of its use to permit a reply rather than confront him with a new theory (albeit based on record evidence) at almost literally the last minute of a long trial. See 1975 House Judiciary Committee Report regarding proposed F.R. Cr.P. 29.1 (H.R.Rep.No.94–247).[16] Since the argument of this appeal, however, the Government has represented in writing that only after Gleason's summation did it for the first time calculate the total losses and discover that they totalled approximately $700,000, which led to its use of the tabulation in its rebuttal summation.

Had no action been taken by the court after the Government's surprise reply summation, a reversal might be required. But Judge Griesa, recognizing the eleventh-hour unfairness and surprise, offered Gleason and the other defendants the opportunity to respond by way of a surrebuttal summation after they had sufficient time to confer and review the trial transcript and exhibits forming the basis of the Government's computation. This in our view adequately protected the defendants against any prejudice. For reasons best known to themselves, possibly their inability to find any material errors in the Government's computation, defense counsel refused the court's offer and instead asked for a curative instruction.[17] Absent proof that the Government's computation was erroneous, the trial judge did not abuse his discretion in refusing a cautionary instruction.

## (3) *Alleged Suppression of Exculpatory Evidence*

Gleason charges that the Government suppressed exculpatory evidence and permitted witnesses to give materially false testimony, thereby depriving him of a fair trial. The record reveals these charges to be both baseless and irresponsible.

Specifically Gleason contends that the Government withheld from the jury evidence supporting multicount indictments, filed on September 29, 1975, January 5, 1977, and March 19, 1979, against Sindona, Shaddick and Bordoni in the Southern District of New York, charging that prior to the falsification of FNB's March 1974 statement those three men, without Gleason's knowledge, had falsified every single monthly foreign exchange profit and loss report beginning with the month of January, 1973, yet permitted Shaddick to testify that he had engaged in falsifying the bank's books on only three occasions during this period and Bordoni to testify that he had participated in only six such transactions. In addition, Gleason argues that the superseding indictment filed against Sindona and Bordoni on March 19, 1979, after Gleason had been convicted, contains a paragraph [18] revealing that the Government had

---

**16.** The House Judiciary Committee commented:

"The Committee believes that . . . fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply."

**17.** We disagree with Gleason's argument that additional summations which might result in introduction of the Government's computation, could not resolve the problem because they would only serve to magnify the unfair impact of the prosecutor's rebuttal. If the computation, based on evidence already in the record, was accurate, the jury was entitled to have the summary as an aid in analyzing the complex proof before it rather than be forced to the laborious task of making its own computation.

The situation here is clearly distinguishable from that in cases relied upon by Gleason where the Government improperly referred to matter not in the record. See, e. g., *Moore v. United States, supra; United States v. Rubinson, supra,* 543 F.2d at 966.

**18.** "On or about March 31, 1974, Sindona and Bordoni, the defendants, and other co-conspirators caused the Franklin National Bank to hide losses in the bond trading operation by misvaluing securities held in bond trading account." Indictment S75 Cr. 948, count I, Par. 54 (S.D.N.Y. March 19, 1979).

evidence that Bordoni and Sindona were involved in the misevaluation of securities in FNB's bank trading account.

The fallacy of Gleason's claims with respect to the 1973–74 false foreign exchange transactions lies in his failure to distinguish between a fraudulent transaction and a false financial statement. Although the fraudulent transactions during this period of time were relatively few, they were reflected in subsequent monthly and quarterly financial statements, which were many. Since each one of the financial statements could properly be charged in a separate count, see *United States v. Huber*, 603 F.2d 387, 398–99 (2d Cir. 1979), and some statements were also charged as violations of federal mail and wire fraud statutes, the number of counts in the superseding indictment far exceeded the number of fraudulent transactions. There is thus no proof that the Government knowingly allowed false testimony.

Were Gleason's counsel unaware of this differentiation, his specious charges might be pardonable. But the earlier superseded indictments (one filed on Sept. 29, 1975, and another on Jan. 5, 1977), which contain basically the same allegations with respect to the 1973–74 foreign exchange transactions, were made available to defense counsel before the trial of the present case, were used extensively by Gleason's counsel on his cross-examination of Bordoni and Shaddick, and could have been used to reveal the supposed perjury on their part. Under the circumstances, Gleason is wholly unjustified in labelling the Government's conduct, as he does in his brief on appeal, as "prosecutorial misconduct," "suppression of evidence," "knowing use of false testimony," failure "to correct false testimony," silence "in the face of their witnesses' perjury," "foul conduct," and resort to "slippery and less than thoroughly upright conduct." [19]

As for the allegation in the last superseding indictment that on March 31, 1974, Sindona and Bordoni caused FNB to conceal losses in its bond trading account by misvaluing securities, the simple and complete answer is that it does not refer to their personal participation in the false security evaluation but merely to acts committed by their co-conspirators in furtherance of the conspiracy to falsify the bank's earnings statement for the first quarter of 1974, for which they could be held criminally responsible under *Pinkerton v. United States, supra.*

## GOVERNMENT'S REFUSAL TO CONFER IMMUNITY ON SINDONA

Gleason contends that his due process rights were violated by the Government's failure to accede to his request that use immunity (i. e., immunity from the use of his testimony and evidence derived from it in subsequent prosecution) be extended to an alleged principal accomplice and co-conspirator, Sindona, who was at the time and remains a defendant named in a separate indictment, 75 Cr. 948, charging him and Bordoni with participation in the same false foreign exchange transactions as those forming a major part of the case against Gleason. We disagree.

As we pointed out in *United States v. Lang*, 589 F.2d 92, 95–96 (2d Cir. 1978), the law is

"well settled that the power of the Executive Branch to grant immunity to a witness is discretionary and no obligation exists on the part of the United States Attorney to seek such immunity. *United States v. Bautista,* 509 F.2d 675, 677 (9th Cir.), cert. denied sub nom. *Monsivais v. United States,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *United States v. Ramsey,* 503 F.2d 523, 532–33 (7th Cir. 1974), cert. denied, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975); *United States v. Berrigan,* 482 F.2d 171, 190 (3d Cir. 1973); *Earl v. United States,* 124

19. These scurrilous statements, which indicate a reckless disregard by counsel for the facts of record, exceed the bounds of responsible advocacy in our adversarial system and merit consideration by the Bar Association Grievance Committee for appropriate action. ABA Code of Professional Responsibility, DR 7–102(A)(1), (2).

U.S.App.D.C. 77, 80, 361 F.2d 531, 534 (1966) (Burger, J.), cert. denied, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *People v. Sapia,* 41 N.Y.2d 160, 166, 391 N.Y.S.2d 93, 359 N.E.2d 688 (1976), cert. denied, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

\* \* \* \* \* \*

"We note that this court has held that the government is not obligated to grant immunity to witnesses so that they may be made available to testify on behalf of the defendant. *United States v. Stofsky,* 527 F.2d 237, 249 (2d Cir. 1975), cert. denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976)."

Moreover, there was no representation that if granted immunity Sindona would furnish specific exculpatory evidence unobtainable from any other source. The most that was suggested through Sindona's counsel, who refused to permit Sindona to talk with Gleason, was that Sindona "would deny any wrongdoing or conversations in furtherance of any wrongdoing with Gleason," which would at best be merely cumulative of Gleason's testimony and from an obviously interested witness who would be subject to intensive cross-examination that might well destroy his credibility.

Nor is this a case where the Government deliberately manipulated grants of immunity to gain an unfair advantage over any defendant, *United States v. Lang, supra,* 589 F.2d at 96–97. The major accomplices who testified (Crosse, Shaddick, Bordoni and Garofalo) were not granted immunity. Only two lesser figures, Thomas Murphy and Bruce Carlton, were promised by the United States Attorney that their statements to him would not be used against them. No sound reason exists, therefore, for departing from the general rule that the Government may refuse to grant immunity.

THE ALLEGED INSUFFICIENCY OF THE CHARGES AND PROOF OF USE OF DECEPTIVE DEVICES IN CONNECTION WITH THE SALE OF SECURITIES

▪▪▪ Gleason contends that Counts 5–14, which allege that the defendants, in violation of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5, used interstate commerce and the mails to employ manipulative and deceptive devices in connection with the purchase and sale of FNB's stock, which was purchased by 12 identified persons on specified dates after the issuance of the false FNB financial statement for the first quarter of 1974, are insufficient for failure to contain specific allegations of misconduct and to set forth all of the elements of a crime. The contention must be rejected for the reason that each count of the indictment followed the precise language of § 10(b), thus alleging all of the essential elements of the crime charged, see *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Carr,* 582 F.2d 242, 244 (2d Cir. 1978). Moreover, by incorporating by reference paragraphs 6–8 of Count One into Counts Five through Fourteen the Government specified the nature of the alleged criminal conduct in sufficient detail to enable the defendants to prepare their defenses and to plead an acquittal or conviction in bar of any future prosecution for the same offense.

▪▪▪ Gleason's further contention that the counts should have been dismissed for the Government's failure to prove any reliance by the specified purchasers of FNB shares upon the bank's false financial statement for the first quarter of 1974 must also be rejected. Despite contrary suggestions in earlier decisions relied on by appellants, the law is settled that the Government need only prove that the false representation is one that a reasonable stockholder would rely on in purchasing or selling the relevant corporate shares, *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860 (2d Cir. 1968) (en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *cf. TSC Indus. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and Judge Griesa so instructed the jury. It is also settled that the same standards apply to civil and criminal liability under the securities law. *United States v. Peltz,* 433 F.2d 48, 53 (2d Cir. 1970), *cert. denied,* 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971).

THE CLAIM THAT THE RECORDS OF THE FRAUDULENT FOREIGN EXCHANGE TRANSACTIONS ARE NOT "FALSE ENTRIES" WITHIN THE MEANING OF 18 U.S.C. § 1005

Gleason's last contention, derived principally from *Coffin v. United States*, 156 U.S. 432, 462–63, 15 S.Ct. 394, 39 L.Ed. 481 (1895), is that those counts of the indictment based on the four deceptive foreign exchange transactions which showed FNB as earning a profit must be dismissed because the transactions took place and were reflected in the bank's books, thus precluding a claim that they were "false entries" within the meaning of § 1005. The argument disregards the indictment and later authority controlling the interpretation of the term "false entry."

The indictment (e. g., Count Three) alleges that the defendants caused a false entry to be made in the bank's books and earnings statement by representing in its financial statement that the bank had earned a profit of $79,000 for the first quarter of 1974 when in fact it had suffered a loss of over $7 million and that this had been accomplished "by means of fictitious and false foreign exchange contracts between said bank and Amincor Bank, Zurich, Switzerland, and Banca Unione, Milan, Italy, which reflected a fictitious profit in the foreign exchange operations of approximately $2,000,000."

▮ It is true that in *Coffin* the Court stated that a crime of making a false entry is not committed if the transaction entered on the books actually took place and was entered as it occurred. 156 U.S. at 463, 15 S.Ct. 394. However, this was modified by *Agnew v. United States*, 165 U.S. 36, 52–54, 17 S.Ct. 235, 41 L.Ed. 624 (1897), holding that a false entry statute may be violated by entering on the books a transaction known to be fraudulent, even though the entry might be accurate. See *United States v. Darby*, 289 U.S. 224, 226–27, 53

S.Ct. 573, 77 L.Ed. 1137 (1933); *United States v. Huber*, 603 F.2d 387, 397–98 (2d Cir. 1979). While an entry is not false merely because the underlying transaction is illegal, see *United States v. Manderson*, 511 F.2d 179, 180–81 (5th Cir. 1975), here the profit shown on the record of the foreign exchange transactions was known by the defendants to be false and fictitious, concocted for the very purpose of distorting the financial statement. The result was a violation of 18 U.S.C. § 1005. See *Billingsley v. United States*, 178 F. 653, 663 (8th Cir. 1910).

▮ We find no merit in appellants' remaining contentions, which require little or no discussion. The district court's grant of one extra peremptory challenge to the Government without the defendants' consent after granting three peremptories to the defendants, while not in compliance with F.R.Cr.P. 24(b),[20] is not shown to have resulted in the selection of a jury that was unrepresentative of the community, or biased in any other way. Nor is any prejudice to appellants shown. The proportional advantage accorded defendants by Rule 24(b) (10 peremptories as against 6 for the Government) was approximately maintained. While the court's action was improper in the absence of defense counsels' consent, we do not believe that reversal is warranted in the absence of prejudice to the defendants.

The judgments of conviction are affirmed.

---

**20.** Although F.R.Cr.P. 24(b) does not authorize the granting of additional peremptories to the Government, it is not uncommon for the court to condition the grant of a defendant's request for additional peremptories on his consent to a proportionate increase being accorded to the Government.