**UNITED STATES of America, Plaintiff,**

v.

**William SHEPPARD, Defendant.**

**82 Cr. 464 (MP).**

United States District Court, S.D. New York.

Jan. 7, 1985.

Rudolph W. Giuliani, U.S. Atty., New York City, for plaintiff; by Barry A. Bohrer of counsel.

Morton Berger, Spring Valley, N.Y. and Shereff, Friedman, Hoffman & Goodman, New York City, for defendant; by Richard D. Weinberg and Cary R. Clewley of counsel.

## OPINION

MILTON POLLACK, Senior District Judge.

The defendant, William Sheppard, moves pursuant to Rule 33, Fed.R.Crim.P., to set aside his conviction on grounds of new evidence and fault of the government in producing documents before trial. He was convicted in September, 1982, of partnership in a scheme whereby $1,256,356.80 was embezzled from Bankers Trust Company by employees of the bank and laundered through Sheppard. The funds were embezzled in the form of two official bank checks and deposited in a bank account opened for purposes of the scheme by Sheppard. The money was converted into gold coins, then into cash, and finally divided among the co-conspirators.

Sheppard's five partners in the embezzlement all pleaded guilty to the conspiracy prior to trial; two pleaded guilty to one count of embezzlement, and one to the count of wire fraud. Three of Sheppard's business partners testified at the trial as government witnesses. Through their testimony, the testimony of a bank investigator, a questioned document examiner, and documentary evidence, as well as the testimony of Sheppard himself, who took the stand, he was firmly planted in the criminal partnership. Sheppard's conviction was unanimously affirmed by order of the Court of Appeals on May 19, 1983, 742 F.2d 1444.

This motion was made almost a year later, on the unsworn assertions of trial counsel for Sheppard, portions of the trial record, and documents which counsel had collected. The government responded promptly, pointing out the insufficiency of the attack on the judgment. A series of requests for an extension of the time for the defendant to reply were granted, and ultimately a new set of attorneys supplied papers comprising an affidavit of the trial lawyer, and a brief designed to set up their principal argument that the government's discovery before trial was faulty and had violated Sheppard's right to due process. Curiously, some of the allegedly undisclosed material was actually produced and used by Sheppard's counsel at the trial. The government has responded to the reply, both by affidavit and a brief.

The government's affidavit and analyses of the issues, which are made part of this ruling, adequately demonstrate that the attempt to set aside the conviction lacks legal merit and is based on speculations which fail utterly to show that the jury would probably have acquitted Sheppard if the points now made had been additionally developed at trial. None of the points now made could possibly have overcome the solidly based record firmly planting the defendant in the embezzlement and laundering operation. The evidence of Sheppard's guilt was overwhelming.

■ No fault on the part of the government has been shown with respect to data that Sheppard now claims was newly discovered and should have been furnished to him, for the reasons that: a) the government either never had such data; or, b) the data was not requested by Sheppard at any time, or fairly identified in any request for data by the defendant; or, c) could have been discovered sooner by the defendant himself with the exercise of due diligence in order to avail himself of Rule 33. The second-guessing which is now

presented does not relate to anything for which Sheppard's counsel had made a sufficiently "specific request" for "particular" information. A request for corporate records in general could hardly constitute a "specific request" for a particular bank deposit slip, or particular checks deposited into a corporate bank account of the business in which he was engaged, especially so where the defendant himself was an authorized signatory of that bank account, and ultimately obtained information from the Bank, by himself, without difficulty. A careful scrutiny of the government's obligations under the informal open discovery suggestions of the court and the compliance therewith in advance of the trial show, unquestionably, that the government fairly and fully disclosed what it could anticipate the defendant might require during the trial. No *Brady* or apparent *Agurs* data was withheld. The best evidence of ample disclosure lies in the fact that no motion for further information was made.

### No Order Directing Discovery Exists

■ Although defendant's papers speak of a "court order" to the parties to engage in discovery, in fact no such order was made. The discovery by the defendant came about through voluntary compliance by the government without any requests from defendant or need for intervention on the part of the Court. This hardly warrants charges of suppression of evidence by the government. The charge now that a few isolated pieces of documentary evidence would have been useful additionally for impeachment, or support of credibility, as the case may be, in isolated aspects of the overall case which could not be foreseen until particular witnesses had testified, gives little support for invoking a Rule 33 remedy.

When the isolated matters complained of are placed in proper focus from which to evaluate the scattershot and unsupportable complaints which ground this motion, it readily can be seen that they have no bearing on the ultimate disposition of the case by the jury. The case against the defend-

ant was too strong to have been influenced by these isolated matters.

### Overview

The speciousness and shallowness of the matters on which the Rule 33 motion is made are at once made apparent by a review of the enormity of Sheppard's criminal conduct. The embezzlement and laundering operations charged in the indictment came about as follows.

Bankers Trust Company held securities for customers on which interest or dividends were paid, to be distributed to the parties entitled thereto. The Depository Trust Company ("DTC") made payments thereof to Bankers Trust on behalf of corporations whose securities were being held by the Bank as custodian for the true owners to whom payments would be distributed. The items collected were reflected in a ledger or journal maintained by DTC containing thousands of bookkeeping or journal entries.

Faulty allocation by Bankers Trust of those dividend and interest payments created in its hands a "pool" of money representing excess funds paid by DTC that had not been accounted for by Bankers Trust; the "pool," in 1981, as reflected in the DTC Dividends Received ledger, was in excess of $50 million. That "pool" was unclaimed money for which the holders of record were unknown.

Certain New York employees of the Bank in the Securities Operations Division perceived that, were entries in the DTC ledger purged, there would be, pro tanto, an elimination of the source and amount of such collections and leave the Bank holding amounts attributable to the purged entries without identification of their owners or true claimants.

The criminal scheme of embezzlement and laundering of the funds abstracted from the Bank developed around this situation.

An employee of the Bank was to eliminate enough of the ledger records of the collected interest and dividends to permit

the Securities Operations Division of the Bank to issue the official bank checks hereafter described against the "pool" and the moneys so embezzled would be passed to the New Jersey defendants—Sramowicz, Sheppard and Burke—who would deposit them in a gold broker's bank account and launder the proceeds by gold coin purchases made by Sheppard; the coins would be delivered to Sheppard and they would then be cashed among the criminal partners and sold by them in whole or in part.

Sheppard readied the New Jersey end of the embezzlement by allegedly setting up such a bank account for "Engelhard Industries," which was given the "A/C #7322461" at Summit Elizabeth Trust Co. (the "Trust Company"), located in Clark, New Jersey. Sheppard had told Sramowicz that he had a former associate in the brokerage business whose identity remained anonymous and who could be instrumental in opening a bank account with the Trust Company, ostensibly for Engelhard Industries, a gold broker. It became known to his partners for the first time when the thefts were investigated by Bankers Trust that Sheppard had actually only used his own name in opening that account. Sheppard also executed a further step in the scheme; he obtained a Post Office Box at the Post Office in Clark, New Jersey, to receive delivery of the gold coins to be purchased with the embezzled funds.

Accordingly, the investment ledger of DTC was purged of entries, as planned, by a compliant employee of Bankers Trust, making it possible for the criminal participants in the Bank to draw two official bank checks on the "pool," each drawn to: "Summit Elizabeth Trust Co. A/C 7322461" as the payee, dated, respectively, September 3, 1981 for $600,970.75, and November 12, 1981 for $655,386.09. The account number of the Trust Company account that Sheppard had opened was given by him to Sramowicz and this had been passed on to his New York confederate at the Bank. The latter had the checks drawn accordingly, and delivered each check to Sramowicz, who in turn hand-delivered each to Sheppard, who then deposited each check (with-out endorsing it) in the Trust Company which collected the funds and credited their A/C 7322461.

In preparation for the next step, Sheppard had communicated with the manager of Manfra, Tordella & Brookes ("MTB"), dealers in gold coin, and apprised him that he would be placing orders for gold coins and gave the Trust Company as reference. After the official checks deposited in the Trust Company had cleared, an employee of the Trust Company, on Sheppard's instructions, placed orders contemporaneously with the collection of each check for gold Krugerrands or for Canadian Maple Leafs with MTB to be purchased on behalf of the numbered account with the Trust Company. Payments for the coins were made by wire transfer directly from the Trust Company to MTB's bank account. The two transactions in gold coins, made respectively on September 16, 1981 and November 25, 1981, amounted, respectively, to $538,487.50, and $638,750.

On Sheppard's instructions, the gold coins were then shipped by MTB to Sheppard's Post Office Box in installments. Sheppard picked up the coins at the local Post Office and brought them to the NRG Industries office, where Sheppard, Sramowicz and Burke ("the three"), made their offices, and placed them in the safe bought by Sheppard at about that time.

The New York employees of the Bank participating in the scheme were allotted ⅔ of the first purchase of coins, and the New Jersey group kept ⅓ of the coins; these proportions were reversed in distributing the avails of the second purchase, with the effect that each group ultimately obtained half of the coins, or the sale proceeds thereof.

The coins retained by the New Jersey conspirators—the three—were in part converted to cash by Burke, who sold a majority of them to Ray's Coin Exchange in Elizabeth, New Jersey. Burke brought the money to NRG, and it was kept in the safe there. A good part of the money was periodically deposited in the NRG bank ac-

count maintained at United Counties Trust Company in Clerk, New Jersey, over which Sheppard held signature power, as did the others. The deposits, on instructions to the Company's accountant, from the three, were recorded in the accounting records of NRG as their capital investments. Sheppard had instructed that one such deposit be recorded in the name of Donald Sheppard, his nephew, who worked at NRG, and that another be recorded in his name, William Sheppard.

The division of the New Jersey share of the embezzlements was ¼ each to the "three" and ¼ was given to Sheppard for delivery to "his man," the anonymous person who, Sheppard said, had set up the arrangements for the "Engelhard Industries" bank account with the Trust Company. Sheppard received $150,000 as his share, and $150,000 for "his man" (who has never surfaced, if, indeed, he existed).

This is the framework of the overwhelming case proved against Sheppard, omitting unnecessary detail. Further illumination to flesh out the story in more detail may be found in the two memoranda and two affidavits of the government which are filed herein. No exception has been taken, or could properly be taken, to the recitals of proven fact contained therein. It is against this broad background, solidly established by credible evidence, witnesses and documents, and corroborated by circumstances, that the isolated straws of purportedly "new" evidence, largely on matters of credibility and all relating to factual questions collateral to the issue of defendant's guilt or innocence, are to be evaluated for purposes of the Rule 33 application.

The specific matters complained of hereon will be examined in greater detail as follows.

1. *Fekete's Testimony and the November Telephone Bill of NRG Industries*

 Unusually large cash deposits in the NRG Industries account at United Counties Trust Co. were made in September and October, 1981. The capital of the corporation had been increased between July 11 and October 31, 1981 from $44,000 to $130,000. Mr. Fekete, the accountant for NRG, testified that each month he went through the checkbook stubs, compared them to the bank statements, and inquired of Sheppard, Sramowicz and Burke where the money had come from, and made his book entries accordingly. He was told, for example, that a $9,300 deposit in NRG was a capital investment by Donald Sheppard, (the defendant's nephew, who was an employee of NRG), and that a $9,600 deposit in NRG was a capital investment by the defendant. Fekete testified that he was told to make such notations at a meeting attended by Sramowicz, Sheppard and Burke. On the basis of that information, he wrote next to the deposits mentioned that they were capital investments attributable to those named. He testified that he went over all of the deposits several times because there were so many alleged capital investments he wanted to ascertain how much was to be attributed to each of the four individuals mentioned above. He recalled asking the question "Do we have to issue the shares of stock to Donald Sheppard as a result of his capital investment?", and the defendant told him "No."

The dispute engendered on this motion concerns the date on which Fekete's conversation with the "three" took place. Fekete testified that it had occurred on November 11, 1981, at the offices of NRG. The defendant denied the conversation and now challenges that date as a result of November telephone bills of NRG that he requested for the first time and obtained after the trial, which purport to indicate that Burke was in fact in Troy, New York, on November 11, 1981. Among the voluminous documentary items that the government had provided for the defendant before the trial were some of the telephone records of the company. NRG continued as a going concern well after those dates.

The initial papers on this motion made by defendant's trial attorney did not allege nor does the record reflect that he made any discovery request for November, 1981 records of NRG Industries, either before or

during trial. The September and October, 1981 telephone records (the period where the scheme was hatched and the Trust Company account and Post Office box were opened by Sheppard and the arrangement for gold coin purchases was made by Sheppard), were introduced by the government (GX 5, 18). Copies of those records were provided to Sheppard before the trial. No specific request was made by the defendant for any other telephone records. That an issue would arise on the trial as to the date of Fekete's meeting with Sramowicz, Burke and Sheppard was problematical; the issue, of course, that could arise was whether such a meeting took place. Sheppard denied the accounting instructions to Fekete. Sramowicz and Burke, in their testimony at the trial, confirmed that those instructions were given to the accountant.

Fekete is a Certified Public Accountant and an Associate Professor of Accountancy at St. Peter's College, and had been the accountant for NRG from October, 1980 through May, 1982. He testified that he conferred with management of NRG monthly for the purpose of recording the receipts and disbursements. He was a totally neutral, disinterested witness, and no claim has been made that he had any motivation to falsify the instructions as to how to record the unusual deposits in the NRG account or from whom they had come. At all events, the actual date of those instructions was of no great moment; the significant matter was the fact that such instructions were given and that the records recorded the same accordingly. The controversy over the defendant's failure to obtain the telephone records for November 10 to 15, 1981, until after the trial fails to raise any matter of significance on the totality of the case itself, or even of Fekete's independence and motivation as a witness.

Sheppard can hardly be said to have made a pretrial request for "specific evidence" within the context of *Brady* and *Agurs* for the November telephone records. Even assuming that counsel was interested in "the records of NRG Industries," this surely did not become a "specific request" for those telephone records as Sheppard

now claims. It did not provide the prosecutor with notice of anything or exactly what the defense desired. *See, e.g., United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976).

## 2. *NRG Industries Bank Records*

■ The defendant now complains that he was not furnished, before the trial, with (a) a deposit slip dated February 19, 1982 reflecting a deposit of $15,200 into the NRG Industries account at United Counties Trust Co.; (b) the Currency Transaction Report with respect to that deposit on February 19, 1982; and, (c) checks deposited to the account of NRG Industries drawn on the account of, one Jaspar Parella.

The short answer to items (a) and (c) is that they were not in the possession of the government. The prosecutor's affidavit clearly shows that NRG's bank did not supply the government with any deposit slips or with any cancelled checks that had been deposited into the NRG account. As a matter of fact, Sheppard had received those deposit slips. Indeed, he utilized many of them in cross-examining the government witness, William Sramowicz, on September 13, 1982.

Apparently, while the United Counties Trust supplied Sheppard with the NRG deposit slips—many of which he used at trial—the bank records reflect that it did not supply him before trial with a copy of the disputed deposit slip dated February 19, 1982 reflecting a deposit of $15,200. Indeed, the bank's records reflect that on September 27, 1982 a copy of that deposit slip was forwarded to a bank branch manager for transmittal to Sheppard—pursuant to Sheppard's request. This disclosure strongly suggests that Sheppard surely could have discovered the $15,200 deposit slip sooner than he did had he exercised due diligence. Thus, this evidence may not be even charitably described as newly discovered.

Significantly, while neither the government, nor Sheppard, had possession of the $15,200 deposit slip at trial, Sheppard did

produce in his defense at trial the original customer receipt for the $15,200 deposit made on February 19, 1982. It was Sheppard himself who injected the matter of the February 19, 1982 deposit of $15,200 into the NRG account. Sheppard, of course, was an authorized signatory of that account at the United Counties Trust Co., and readily could obtain any information that he wanted from that bank, and he cannot demonstrate that the disputed information "could not have been discovered sooner with the exercise of due diligence." *United States v. Dukes*, 727 F.2d 34, 38 (2d Cir.1984); *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980).

Contrary to Sheppard's claim, item "(b)" above, regarding the government's failure to furnish Sheppard with a copy of the Currency Transaction Report ("CTR") prepared by the bank, though utilized by the government in cross-examining Sheppard, presents no reasonable likelihood that a pretrial discovery of the CTR would have influenced the jury's assessment of his credibility. Wholly apart from a fleeting impeachment with the CTR, the jury reasonably could have rejected Sheppard's version of events as utterly implausible, based on, among other things, Sheppard's self-serving preservation of, and introduction into evidence, of a copy of a torn check and torn deposit slip—which the jury requested during its deliberations. The government was not required to fish out and disclose the CTR to Sheppard prior to trial. The document became relevant for impeachment purposes only after Sheppard testified on direct that he and not Burke "deposited the $15,200 in the NRG account," thus seeking to corroborate his defense that he was open and forthright in his financial dealings. *See United States v. Gleason*, 616 F.2d 2, 24 (2d Cir.1979, *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980)). There was no obligation on the part of the government to anticipate Sheppard's testimony and then furnish him with otherwise irrelevant material that might conflict with that testimony.

Even after he was confronted with the CTR, Sheppard did not request a continuance to permit preparation of a more plausible reconciliation between the documents and his direct testimony. Any claim of prejudice in his failure to have the document in advance of trial is purely gossamer. The deposit of $15,200 was raised solely by Sheppard at trial, and until he injected the matter into the trial, from all appearances the CTR reflected a transaction of Burke's about which Burke did not testify. And while Sheppard raised the matter of the $15,200 deposit, he also corroborated his testimony by introducing an original customer's receipt that he had received upon making the deposit and produced at the trial. On cross-examination, the government merely, in a single question or two, inquired about the apparent discrepancy between Sheppard's testimony and the CTR reflecting the transaction. By no stretch of the imagination could the fleeting possible impeachment with the CTR affect the outcome of the trial.

3. *Legible Copies of the NRG Checking Account Statements*

■ The moving party complains that the government failed to supply copies of the NRG checking account statements that were "legible." The copies supplied were xerox copies of copies in the possession of the government. On the government's copy, Burke had underlined in yellow the deposits representing embezzled funds. The yellow underscoring apparently did not show up when the copy was xeroxed.

The belated claim that the government failed to provide Sheppard with "clear copies" of the NRG checking account statements, reflecting emphasis supplied by Burke in preparing for trial, is considerably short of a reasonable complaint. At the time, when the government turned over the copy of the checking account statements, the defendant's attorney made no complaint and didn't request a better copy. Sheppard does not claim that the government failed to disclose the deposits as shown by the bank—they were clearly reflected on the monthly statements provided to him. Rather, he complains that the

government failed to identify those to which the witness would particularly address himself or to identify the source of the funds deposited. The government had no such obligations.

### 4. *Burke's Understanding with the Government*

The defendant raises a question concerning Burke's trial testimony that he had no understanding with the government concerning an indictment pending against him in New Jersey. He had testified that his cooperation in this case would be pointed out to this Court at the time of sentencing in this Court.

The attorney for the defendant claims that, on July 13, 1984, he encountered the lawyer for Burke in the New Jersey matter, who told Mr. Berger, the lawyer in this case, that there was an understanding with the federal government in New York that they would bring to the attention of the New Jersey authorities Burke's cooperation in the Sheppard case. The Berger affidavit further says that he was advised that following the Sheppard trial the federal government wrote a letter to the New Jersey Court advising the New Jersey Court of Burke's appearance in this Court. The moving papers hereon say that the government simply failed to discharge one of its essential *Brady* obligations—to provide the defendant with a complete understanding of any agreement between the government and one of its witnesses.

On the contrary, Burke testified that he had entered into an agreement with the government when he pleaded guilty to one count of conspiracy; that his agreement was that in exchange for his cooperation, that would be pointed out to the Judge in this Court at the time of his sentencing. The agreement was marked as Government Exhibit 13 for identification. The government's affidavit asserts that through both Burke's testimony and the cooperation agreement, Exhibit 13, to which Sheppard had ready access, Sheppard had been provided with the "complete understanding"

between Burke and the government. There is no evidence to the contrary.

### *Conclusion*

The strands of additional possible proof that the defendant might have brought to the jury's attention, here euphemistically described as "newly discovered evidence," present no probability that the introduction thereof at trial would have resulted in Sheppard's acquittal. No fault may be legitimately ascribed to the prosecution concerning the pre-trial discovery or the failure to have supplied the "new" material to the defendant.

The motion is, on analysis, highly frivolous, lacking in factual and legal merit and based on unworthy and insufficient claims.

Motion Denied.